## HARTE-HANKS COMMUNICATIONS, INC. *v.* CONNAUGHTON

CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR
THE SIXTH CIRCUIT

No. 88–10.   Argued March 20, 1989—Decided June 22, 1989

658

*Lee Levine* argued the cause for petitioner. With him on the briefs were *Richard L. Creighton, Jr., Kevin E. Irwin, Michael D. Sullivan,* and *James E. Grossberg.*

*John A. Lloyd, Jr.,* argued the cause for respondent. With him on the brief were *Sallie Conley Lux* and *Jeanette H. Rost.* *

JUSTICE STEVENS delivered the opinion of the Court.

A public figure may not recover damages for a defamatory falsehood without clear and convincing proof that the false "statement was made with 'actual malice'—that is, with knowledge that it was false or with reckless disregard of whether it was false or not." *New York Times Co.* v. *Sullivan,* 376 U. S. 254, 279–280 (1964). See *Curtis Publishing Co.* v. *Butts,* 388 U. S. 130, 162 (1967) (opinion of Warren, C. J.). In *Bose Corp.* v. *Consumers Union of United States, Inc.,* 466 U. S. 485 (1984), we held that judges in such cases have a constitutional duty to "exercise independent judgment and determine whether the record establishes actual malice with convincing clarity." *Id.,* at 514. In this case the Court of Appeals affirmed a libel judgment against a newspaper without attempting to make an independent evaluation of the credibility of conflicting oral testimony concerning the subsidiary facts underlying the jury's finding of actual malice. We granted certiorari to consider whether the Court of Appeals' analysis was consistent with our holding in *Bose.* 488 U. S. 907 (1988).

---

*A brief of *amici curiae* urging reversal was filed for the Associated Press et al. by *P. Cameron DeVore, Daniel M. Waggoner, Douglas P. Jacobs, Alice N. Lucan, Mark L. Tuft, Harvey L. Lipton, Jeffrey N. Paule, Lois J. Schiffer, Robert D. Sack, E. Susan Garsh, William A. Niese, Deborah R. Linfield, Samuel E. Klein, W. Terry Maguire, Rene P. Milam, Richard M. Schmidt, Roslyn A. Mazer, Lawrence Gunnels, Steven R. Shapiro, Robert J. Brinkmann, J. Laurent Scharff, Jane Kirtley,* and *Bruce W. Sanford.*

I

Respondent, Daniel Connaughton, was the unsuccessful candidate for the office of Municipal Judge of Hamilton, Ohio, in an election conducted on November 8, 1983. Petitioner is the publisher of the Journal News, a local newspaper that supported the reelection of the incumbent, James Dolan. A little over a month before the election, the incumbent's Director of Court Services resigned and was arrested on bribery charges. A grand jury investigation of those charges was in progress on November 1, 1983. On that date, the Journal News ran a front-page story quoting Alice Thompson, a grand jury witness, as stating that Connaughton had used "dirty tricks" and offered her and her sister jobs and a trip to Florida "in appreciation" for their help in the investigation.

Invoking the federal court's diversity jurisdiction, Connaughton filed an action for damages, alleging that the article was false, that it had damaged his personal and professional reputation, and that it had been published with actual malice. After discovery, petitioner filed a motion for summary judgment relying in part on an argument that even if Thompson's statements were false, the First Amendment protects the accurate and disinterested reporting of serious charges against a public figure. The District Court denied the motion, noting that the evidence raised an issue of fact as to the newspaper's interest in objective reporting and that the "neutral reportage doctrine" did not apply to Thompson's statements.[1] The case accordingly proceeded to trial.

---

[1] The District Court explained that the neutral reportage doctrine, as defined by the Ohio Court of Appeals, see *J. V. Peters & Co.* v. *Knight Ridder Co.*, 10 Media L. Rptr. 1576 (1984), and the United States Court of Appeals for the Second Circuit, see *Edwards* v. *National Audubon Society, Inc.*, 556 F. 2d 113, cert. denied, 434 U. S. 1002 (1977), "immunizes from liability the accurate and disinterested reporting of serious charges made against a public figure by a responsible, prominent organization." App. to Pet. for Cert. 78a. Because the court was convinced that Thompson did not qualify as "a responsible, prominent organization on a par with

After listening to six days of testimony and three taped interviews—one conducted by Connaughton and two by Journal News reporters—and reviewing the contents of 56 exhibits, the jury was given succinct instructions accurately defining the elements of public figure libel and directed to answer three special verdicts.[2]  It unanimously found by a preponderance of the evidence that the November 1 story was defamatory and that it was false.   It also found by clear and convincing proof that the story was published with actual malice.   After a separate hearing on damages, the jury awarded Connaughton $5,000 in compensatory damages and $195,000 in punitive damages.   Thereafter, the District Court denied a motion for judgment notwithstanding the verdict, App. to Pet. for Cert. 83a, and petitioner appealed.

---

the State Attorney General's Office in *J. V. Peters* or the National Audubon Society in *Edwards*," it concluded that the defense was unavailable. *Ibid.*

Petitioner did not argue in its petition for a writ of certiorari, and does not now argue, that the neutral reportage doctrine immunized its coverage of Thompson's allegations.   Accordingly, we do not review this aspect of the District Court's judgment.

[2] The jury was asked:

1. "Do you unanimously find by a preponderance of the evidence that the publication in question was defamatory toward the plaintiff?"

2. "Do you unanimously find by a preponderance of the evidence that the publication in question was false?"

3. "Do you unanimously find by clear and convincing proof that the publication in question was published with actual malice?"   App. 201.

There is some debate as to whether the element of falsity must be established by clear and convincing evidence or by a preponderance of the evidence.   Compare *Firestone* v. *Time, Inc.*, 460 F. 2d 712, 722–723 (CA5) (Bell, J., specially concurring), cert. denied, 409 U. S. 875 (1972), with *Goldwater* v. *Ginzburg*, 414 F. 2d 324, 341 (CA2 1969), cert. denied, 396 U. S. 1049 (1970).   See also *Tavoulareas* v. *Piro*, 260 U. S. App. D. C. 39, 63–64, n. 33, 817 F. 2d 762, 786, n. 33 (en banc), cert. denied, 484 U. S. 870 (1987); Franklin & Bussel, The Plaintiff's Burden in Defamation: Awareness and Falsity, 25 Wm. & Mary L. Rev. 825, 863–865 (1984).   We express no view on this issue.

The Court of Appeals affirmed. 842 F. 2d 825 (CA6 1988). In a lengthy opinion, the majority detailed why its "independent examination of the entire record" had demonstrated that "the judgment does not pose a forbidden intrusion into the First Amendment rights of free expression." *Id.*, at 828. The opinion identified the "core issue" as "simply one of credibility to be attached to the witnesses appearing on behalf of the respective parties and the reasonableness and probability assigned to their testimony." *Id.*, at 839–840. It separately considered the evidence supporting each of the jury's special verdicts, concluding that neither the finding that the article was defamatory[3] nor the finding that it was false[4] was clearly erroneous.

The Court of Appeals' review of the actual malice determination involved four steps. It first noted the wide disparity between the respective parties' versions of the critical evidence, pointing out that if the jury had credited petitioner's evidence it "could have easily concluded that Thompson's

---

[3] The Court of Appeals observed that "the article was defamatory in its implication that Connaughton was an unethical lawyer and an undesirable candidate for the Hamilton Municipal judgeship who was capable of extortion, who was a liar and an opportunist not fit to hold public office, particularly a judgeship." 842 F. 2d, at 840–841.

[4] As to the finding of falsity, the Court of Appeals wrote:

"Equally apparent from the jury's answer to the second special interrogatory is that it considered the published Thompson charges to be false. Its finding is understandable in light of the plaintiff's proof which disclosed that the *Journal*'s effort to verify her credibility ended in an avalanche of denials by knowledgeable individuals; [and] its inability to produce a single person who supported Thompson's accusations . . . .

"Moreover, the jury obviously refused to credit the *Journal*'s construction of Connaughton's interview of October 31. It accepted Connaughton's express denials of each Thompson charge and considered the significant language interpreted by the *Journal* to constitute his admissions of those charges, when read in context, as nothing more than conjecture elicited by structured questions calculated to evoke speculation. Thus, upon reviewing the record in its entirety, this court concludes that the jury's determinations of the operational facts bearing upon the falsity of the article in issue were not clearly erroneous." *Id.*, at 841.

charges were true and/or that the *Journal*'s conduct in determining Thompson's credibility was not a highly unreasonable departure from the standards of investigation and reporting ordinarily adhered to by reasonable publishers." *Id.*, at 840. Second, it inferred from the jury's answers to the three special interrogatories that "it obviously elected to assign greater credibility to the plaintiff's witnesses and proof [and that] the jury simply did not believe the defendants' witnesses, its evidentiary presentations or its arguments." *Ibid.* Third, having considered what it regarded as the "subsidiary or operative facts" that constituted the plaintiff's theory of the case, it concluded that the jury's findings concerning those operative facts were not clearly erroneous. *Id.*, at 843–844. Fourth, "in the exercise of its independent judgment" based on its evaluation of the "cumulative impact of the subsidiary facts," the court concluded that "Connaughton proved, by clear and convincing evidence, that the *Journal* demonstrated its actual malice when it published the November 1, 1983, article despite the existence of serious doubt which attached to Thompson's veracity and the accuracy of her reports." *Id.*, at 846.

Judge Guy dissented. In his opinion the admissions made by Connaughton in his interview with Journal News reporters the day before the story was published sufficiently corroborated Thompson's charges to preclude a finding of actual malice. *Id.*, at 853–854. He was satisfied, as a matter of law, that respondent had failed to prove actual malice by clear and convincing evidence, regardless of whether determinations of credibility made by the jury are subject to a *de novo* standard of review. *Id.*, at 855.

## II

Petitioner contends that the Court of Appeals made two basic errors. First, while correctly stating the actual malice standard announced in *New York Times Co.* v. *Sullivan*, 376 U. S. 254 (1964), the court actually applied a less severe

standard that merely required a showing of "'highly unreasonable conduct constituting an extreme departure from the standards of investigation and reporting ordinarily adhered to by responsible publishers.'" 842 F. 2d, at 845 (quoting *Curtis Publishing Co.* v. *Butts*, 388 U. S., at 155 (opinion of Harlan, J.)). Second, the court failed to make an independent *de novo* review of the entire record and therefore incorrectly relied on subsidiary facts implicitly established by the jury's verdict instead of drawing its own inferences from the evidence.

There is language in the Court of Appeals' opinion that supports petitioner's first contention. For example, the Court of Appeals did expressly state that the Journal News' decision to publish Alice Thompson's allegations constituted an extreme departure from professional standards.[5] Moreover, the opinion attributes considerable weight to the evidence that the Journal News was motivated by its interest in the reelection of the candidate it supported and its economic interest in gaining a competitive advantage over the Cincin-

---

[5] The Court of Appeals wrote:

"In *Curtis Publishing Co.* v. *Butts*, the Supreme Court accorded public figures as well as public officials recovery of damages for the publication of 'defamatory falsehood whose substance makes substantial danger to reputation apparent, on a showing of highly unreasonable conduct constituting an extreme departure from the standards of investigation and reporting ordinarily adhered to by responsible publishers.' 388 U. S. at 155." *Id.*, at 845.

At another point, the court wrote:

"Accordingly, this court concludes that the *Journal*'s decision to rely on Thompson's highly questionable and condemning allegations without first verifying those accusations through her sister, [Stephens], and without independent supporting evidence constituted *an extreme departure from the standards of investigation and reporting ordinarily adhered to by responsible publishers* which demonstrated a reckless disregard as to the truth or falsity of Thompson's allegations and thus provided clear and convincing proof of 'actual malice' as found by the jury. *Butts*, 388 U. S. at 153." *Id.*, at 847 (emphasis supplied).

See also *id.*, at 840.

nati Enquirer, its bitter rival in the local market.[6] Petitioner is plainly correct in recognizing that a public figure plaintiff must prove more than an extreme departure from professional standards and that a newspaper's motive in publishing a story—whether to promote an opponent's candidacy or to increase its circulation—cannot provide a sufficient basis for finding actual malice.

The language in the Court of Appeals' opinion discussing professional standards is taken from Justice Harlan's plurality opinion in *Curtis Publishing Co.* v. *Butts, supra,* at 155. In that case, Justice Harlan had opined that the *New York Times* actual malice standard should be reserved for cases brought by public officials. The *New York Times* decision, in his view, was primarily driven by the repugnance of seditious libel and a concern that public official libel "lay close" to

---

[6] As to the newspaper's motives, the Court of Appeals asserted:

"A review of the entire record of the instant case discloses substantial probative evidence from which a jury could have concluded (1) that the *Journal* was singularly biased in favor of [the incumbent] and prejudiced against Connaughton as evidenced by the confidential personal relationship that existed between [the incumbent] and Blount, the *Journal* Editorial Director, and the unqualified, consistently favorable editorial and daily news coverage received by [the incumbent] from the *Journal* as compared with the equally consistent unfavorable news coverage afforded Connaughton; (2) that the *Journal* was engaged in a bitter rivalry with the *Cincinnati Enquirer* for domination of the greater Hamilton circulation market as evidenced by Blount's vituperous public statements and criticism of the *Enquirer;* (3) that the *Enquirer*'s initial expose of the questionable operation of the [incumbent's] court was a high profile news attraction of great public interest and notoriety that had 'scooped' the *Journal* and by Blount's own admission was the most significant story impacting the . . . campaign[;] (4) that by discrediting Connaughton the *Journal* was effectively impugning the *Enquirer* thereby undermining its market share of the Hamilton area." *Id.,* at 843.

Later in the opinion, the court again stressed that "the evidence adduced at trial demonstrated that the *Journal* was motivated to publicize Thompson's allegations, not only by a desire to establish its preeminence in the reporting of Hamilton political news, but also by a desire to aid the [incumbent's] campaign." *Id.,* at 846.

this universally renounced, and long-defunct, doctrine. 388 U. S., at 153. In place of the actual malice standard, Justice Harlan suggested that a public figure need only make "a showing of highly unreasonable conduct constituting an extreme departure from the standards of investigation and reporting ordinarily adhered to by responsible publishers." *Id.*, at 155. This proposed standard, however, was emphatically rejected by a majority of the Court in favor of the stricter *New York Times* actual malice rule. See 388 U. S., at 162 (opinion of Warren, C. J.); *id.*, at 170 (Black, J., dissenting); *id.*, at 172 (BRENNAN, J., dissenting). Moreover, just four years later, Justice Harlan acquiesced in application of the actual malice standard in public figure cases, see *Rosenbloom* v. *Metromedia, Inc.*, 403 U. S. 29, 69–70 (1971) (dissenting opinion), and by the time of the Court's decision in *Gertz* v. *Robert Welch, Inc.*, 418 U. S. 323 (1974), the Court was apparently unanimously of this view. Today, there is no question that public figure libel cases are controlled by the *New York Times* standard and not by the professional standards rule, which never commanded a majority of this Court.

It also is worth emphasizing that the actual malice standard is not satisfied merely through a showing of ill will or "malice" in the ordinary sense of the term.[7] See *Beck-*

---

[7] The trial judge correctly instructed the jury that "[a]ctual malice may not be inferred alone from evidence of personal spite, ill will or intention to injure on the part of the writer." App. 199.

The phrase "actual malice" is unfortunately confusing in that it has nothing to do with bad motive or ill will. See *Rosenbloom* v. *Metromedia, Inc.*, 403 U. S. 29, 52, n. 18 (1971) (opinion of BRENNAN, J.). By instructing the jury "in plain English" at appropriate times during the course of the trial concerning the not-so-plain meaning of this phrase, the trial judge can help ensure that the *New York Times* standard is properly applied. *Tavoulareas*, 260 U. S. App. D. C., at 84, 817 F. 2d, at 807 (R. B. Ginsburg, J., concurring). See also *Westmoreland* v. *CBS Inc.*, 596 F. Supp. 1170, 1172–1173, n. 1 (SDNY 1984) (suggesting that jury confusion can be minimized if a less confusing phrase, such as "state-of-mind," "delib-

*ley Newspapers Corp.* v. *Hanks,* 389 U. S. 81 (1967) *(per curiam); Henry* v. *Collins,* 380 U. S. 356 (1965) *(per curiam).* Indeed, just last Term we unanimously held that a public figure "may not recover for the tort of intentional infliction of emotional distress . . . without showing . . . that the publication contains a false statement of fact which was made . . . with knowledge that the statement was false or with reckless disregard as to whether or not it was true." *Hustler Magazine, Inc.* v. *Falwell,* 485 U. S. 46, 56 (1988). Nor can the fact that the defendant published the defamatory material in order to increase its profits suffice to prove actual malice. The allegedly defamatory statements at issue in the *New York Times* case were themselves published as part of a paid advertisement. 376 U. S., at 265–266. If a profit motive could somehow strip communications of the otherwise available constitutional protection, our cases from *New York Times* to *Hustler Magazine* would be little more than empty vessels. Actual malice, instead, requires at a minimum that the statements were made with a reckless disregard for the truth. And although the concept of "reckless disregard" "cannot be fully encompassed in one infallible definition," *St. Amant* v. *Thompson,* 390 U. S. 727, 730 (1968), we have made clear that the defendant must have made the false publication with a "high degree of awareness of . . . probable falsity," *Garrison* v. *Louisiana,* 379 U. S. 64, 74 (1964), or must have "entertained serious doubts as to the truth of his publication," *St. Amant, supra,* at 731.

Certain statements in the Court of Appeals' opinion, when read in isolation, appear to indicate that the court at times substituted the professional standards rule for the actual malice requirement and at other times inferred actual malice from the newspaper's motive in publishing Thompson's story. Nevertheless, when the opinion is read as a whole, it is clear that the conclusion concerning the newspaper's departure

erate or reckless falsity," or "constitutional limitation" is used in the jury's presence).

from accepted standards and the evidence of motive were merely supportive of the court's ultimate conclusion that the record "demonstrated a reckless disregard as to the truth or falsity of Thompson's allegations and thus provided clear and convincing proof of 'actual malice' as found by the jury." 842 F. 2d, at 847. Although courts must be careful not to place too much reliance on such factors, a plaintiff is entitled to prove the defendant's state of mind through circumstantial evidence, see *Herbert* v. *Lando,* 441 U. S. 153, 160 (1979); *Tavoulareas* v. *Piro,* 260 U. S. App. D. C. 39, 66, 817 F. 2d 762, 789 (en banc), cert. denied, 484 U. S. 870 (1987), and it cannot be said that evidence concerning motive or care never bears any relation to the actual malice inquiry. Thus, we are satisfied that the Court of Appeals judged the case by the correct substantive standard.

The question whether the Court of Appeals gave undue weight to the jury's findings—whether it failed to conduct the kind of independent review mandated by our opinion in *Bose*—requires more careful consideration. A proper answer to that question must be prefaced by additional comment on some of the important conflicts in the evidence.

## III

The most important witness to the bribery charges against the Director of Court Services was Patsy Stephens, Alice Thompson's older sister. In a tape-recorded interview conducted in Connaughton's home between 12:30 and 4:30 a.m. on September 17, 1983, Stephens explained how, on 40 or 50 occasions, she had visited with the Court Administrator, Billy Joe New, in his office and made cash payments to dispose of "DUI" and other minor criminal charges against her former husband and various other relatives and acquaintances.[8] On September 22, pursuant to an arrangement

---

[8] Early in September Connaughton's wife Martha was advised that Patsy Stephens was willing to disclose important information about the special treatment her former husband had received in the Hamilton Munic-

made by Connaughton at the suggestion of the county pros-
ecutor, Stephens took a lie detector test. After learning
that she had passed the test, Connaughton filed a written
complaint against New. In due course, New was arrested,
indicted, and convicted.

Alice Thompson was one of the eight persons present at
the tape-recorded interview on September 17.[9] One of
the cases Patsy Stephens described was a shoplifting charge
against her sister. Thompson volunteered some comments
about the incident, but otherwise had little to say during the
long interview with Stephens. Thompson was also present
on the 22d, when Stephens took the polygraph test, but
Thompson declined to submit to such a test. App. 301. On
that day, the two sisters spent several hours in the company
of Connaughton, his wife, and two of his supporters. They
discussed a number of subjects, including the fact that Billy
Joe New had just resigned, the question whether there was
reason to be concerned about the safety of the two sisters,
the fact that Martha Connaughton might open an ice cream
parlor sometime in the future, the possibility that the two sis-
ters might be employed there as waitresses, and a vacation in
Florida planned by the Connaughtons for after the election.

---

ipal Court. The source of this advice was the president of the local chap-
ter of Mothers Against Drunk Driving. Martha Connaughton and her
brother then visited with Patsy Stephens in her mother's home for about
30 minutes and arranged for a later interview with Connaughton. Alice
Thompson was present at a part of that meeting, as well as at the subse-
quent interview. Shortly before midnight on September 16, after Patsy
Stephens and Alice Thompson had returned home from work, two of Con-
naughton's supporters (Berry and Cox) picked the two sisters up and drove
them to Connaughton's home where they remained until about 4:30 a.m. on
September 17.

[9] The other seven were: Patsy Stephens, Dan and Martha Connaughton,
Martha Connaughton's brother Dave Berry, Connaughton's campaign
manager, Joe Cox, and two of Connaughton's neighbors, Jeanette and
Ernest Barnes.

Late in October, New's lawyer, Henry Masana, met with
Jim Blount, the editorial director of the Journal News, and
Joe Cocozzo, the newspaper's publisher, to arrange a meet-
ing with Alice Thompson. Masana explained that Thompson
wanted to be interviewed about the "dirty tricks" Connaugh-
ton was using in his campaign. Thereafter, on October 27,
Blount and Pam Long, a Journal News reporter, met with
Thompson in the lawyer's office and tape-recorded the first of
the two interviews that provided the basis for the story that
Long wrote and the Journal News published on November 1.

The tape of Alice Thompson's interview is 1 hour and 20
minutes long. Significant portions of it are inaudible or inco-
herent. It is clear, however, that Thompson made these
specific charges:

—that Connaughton had stated that his purpose in taping
the interview with Patsy Stephens was to get evidence with
which he could confront New and Judge Dolan and "scare
them into resigning" without making any public use of the
tapes;[10]

---

[10] "A. They started asking me a bunch of questions so I asked Dan
Connaughton . . . . I said why are you doing this . . . . And of course,
he turned off the tape recorder. And he said, I'll tell you the truth. He
said, all I want is to get enough evidence on Billy, he said, and have Billy
resign. And he said, of course, if Billy resigns, Dolan will resign, and he
said, then I can just step up on the bench. . . . But he said right out of his
own mouth, all I want to do is to get a story in evidence on them, to meet
them face to face, and show them what evidence he had against him, or
whatever, to get them to resign, and no more would be said about it.

. . . . .

"Q. Okay. So in other words, based on what he said to you, you be-
lieved him?

"A. Blackmail. I mean, you know, the way he phrased it, the way he
said it, you know. He said all he wanted to do was get enough evidence on
Billy, and he also used Dolan's name, which I don't know what he was
going to get on Dolan—to scare them into resigning. I said what happens
when they resign? Nothing more will be said about anything. He said
when I take the bench nothing will be said." App. 291–292.

—that he would pay the expenses for a 3-week vacation in Florida for the two sisters;[11]

—that he would buy a restaurant for the two sisters' parents to operate;[12]

---

[11] "A. . . . I asked them what I was going to get out of it.

"Q. What did they promise you?  Or what did they say when you asked them?

"A. They said my help would be deeply appreciated.  And they went on to talk about the three weeks vacation they was planning on taking when the election was . . .

"Q. He was planning to take three weeks vacation?

"A. Yes, the family—Dave Berry and Martha, and Dan.

"MR. BLOUNT: They wanted you to go along?

"A. Me and my sister would be welcome to go along with Dave . . .

"(By Mrs. Long)

"Q. Did they say they would pay your expenses?

"A. Yeah.  I made it clear to them that I couldn't afford a trip to Florida.

"MR. BLOUNT: Was the tape recorder on at that time?

"A. Oh, no.

"(By Mrs. Long)

"Q. Now where were they going to go?

"A. Three weeks in Florida.

"Q. And they added Disneyworld?

"A. (Inaudible) a three weeks trip to Florida.  And they had a friend in Florida that wouldn't be home at the time, that we could stay at their condominium." *Id.*, at 293–294.

[12] "A. . . . [Connaughton] said he was thinking about putting a restaurant in there, and he was wanting to know if my mother and father [Zella and Brownie Breedlove] would run it for him.  And I said oh yeah, my mother would love to get back into the restaurant business.  He said good, when the lease is up, he said, we'll tear the inside out and put a restaurant in there, and he said, your mother and father can run it, and he said that way, he said you girls can help run it too, and put your sisters in there working too; he said just . . . he even made up a name—Breedlove's Lunch or something like that.  Ma Breedlove's Cooking, you know.  He had the names figured out and everything.  He offered to buy us a restaurant, you know, and put us in that building.

"Q. Okay.  So it would just be your parents being a manager, they wouldn't have to buy—did you understand him that they wouldn't have to . . .

—that he would provide jobs for both Patsy Stephens and Alice Thompson;[13]

—that he would take them out to a victory dinner at an expensive French restaurant after the election;[14] and

—that Connaughton would not allow knowledge of the sisters' involvement to become public.[15]

---

"A. Oh, they was going to do everything, you know. They was just going to put us in there to work, or to run it. They wanted my mother to run the business for them." *Id.*, at 307.

[13] "Q. Did he promise you to find a job?

"A. Yeah.

"Q. Why did he offer to find you a job?

"A. Because the day at the house, going back to the first time I met them, Martha was asking me did I work, or anything, and I was telling her I was looking for work. I had been out of a job. Evidently she must have talked to her husband about it, and that night over at his home, he said are you employed now, you know, . . . and I said no. So he said, we'll see if we can't do something about that. I told him I wanted away from bartending and stuff; he said we'll see if we can't do something about it. You know, a decent job." *Id.*, at 295–296.

"MR. MASANA: I'm going to interject. What about the job you were promised?

"A. Oh, when they promised me, you know, the secure job and everything, they also promised—they promised Patsy a job too.

(By Mrs. Long)

"Q. That she would be in with Breedlove's Lunch, or cafe?

"A. No, they promised Patsy a decent job, you know.

"Q. That she would be (inaudible).

"A. That she would be good up in Court. That come out of his own mouth. That come out of Dan's mouth; he said we need somebody like you up at the courthouse. Municipal Court." *Id.*, at 309.

[14] "A. . . . And he said he wanted me and Pat to definitely be there, and for a victory dinner he wanted to take me and Patsy to dinner at the Maisonette.

"Q. This would be after he wins the election?

"A. Ummm-hmmm." *Id.*, at 306.

[15] "A. . . . But as far as anybody else, the public, or anything like that— or it going to Court, we wouldn't have to worry about it; we wouldn't have to go to Court and our names wouldn't be on there." *Id.*, at 296.

"A. [T]hey had already promised that our names wouldn't be mentioned that nobody would know about us . . . ." *Id.*, at 302.

During the course of the interview, Thompson indicated that she had told her story to the Cincinnati Enquirer, which declined to print it, *id.*, at 284, and that the local police, likewise, were not interested, *id.*, at 310.[16] Thompson indicated that she was "against" Connaughton becoming a judge. *Id.*, at 311. She also asserted that since Connaughton had made public that she and her sister had provided evidence against New, friends had accused her "of being a snitch and a rat"—epithets to which she took great offense—and that one reason she came to the Journal News was "to get that cleared up."[17] In her description of the interview in Connaughton's home on September 17, Thompson stated that Connaughton had frequently turned off the tape recorder,[18] that his voice would not be heard

---

[16] The transcript of the interview quotes Thompson as saying: "I explained to them the whole story, how it got off to this, or that, you know. They was embarrassed evidently." *Id.*, at 310. However, the tape recording of the interview, which the jury heard, makes clear that Thompson actually stated: "I explained to them the whole story, how I got offered this and that, you know. They wasn't interested in this evidently." Defendant's Exh. J.

[17] "A. . . . Can't get any worse than what Dan (inaudible). Makes it sound like I'm the bad guy.
"Q. Have you had any repercussions from this?
"A. I've been under a lot of (inaudible) strain. I guess.
"Q. Other people calling you besides the Enquirer?
"A. Yeah. I've had people that I thought were my friends call me and accuse me of being a snitch and a rat. I don't like to carry that name, and that's what a lot of people is thinking. That knows me.
"MR. BLOUNT: They were just mad, they didn't threaten you?
"A. (inaudible) a snitch. You name it, and I'm that. I just want to get that cleared up." App. 320.

[18] "A. . . . I said, what's the whole deal? And of course, he turned off the tape recorder. . . .

"MR. BLOUNT: Was being questioned by the Connaughtons tougher than going to Court?
"A. Ummm-hmmm. They turned that tape recorder on and off so many times, you know, left out what they wanted to.

on the tape,[19] and, somewhat inconsistently (and in response to a leading question), that most of her comments had been made in response to leading questions by Connaughton.[20]

Toward the end of the interview, Blount made two significant comments. He announced that "Pam will, of course, write the story," *id.*, at 314, and he asked "[w]hat would happen if we called your sister," *id.*, at 316. In response to the first comment, Thompson volunteered a somewhat improbable explanation for her motivation in seeking the interview,[21]

---

"MR. BLOUNT: Was the tape recorder on at that time?

"A. Oh, no." *Id.*, at 291–293.

[19] "MR. BLOUNT: They had it on when you were talking and off when they were talking?

"A. I don't think Dan Connaughton's voice is on it." *Id.*, at 293.

"MR. BLOUNT: Was it Dan Connaughton himself who talked about the trip?

"A. Yeah. He did most of the talking in the living room. Like I said though the tape recorde[r] was off when Dan spoke." *Id.*, at 295.

[20] "MR. MASANA: Off the record—you were saying something about Dan was encouraging you to say things in a certain way?

"A. Oh, yeah. He was leading me in questions, you know.

(By Mrs. Long)

"Q. Can you give us an example?

"A. Well, he kept on trying to get me to say that Dolan had something to do with this, you know?

"Q. Would he phrase it in a question? Like, did Judge Dolan have anything to do with it?

"MR. BLOUNT: Wasn't it true that Judge Dolan did this, or something?

"A. Yeah, you know, and so on. But like I say, if you listen to the tapes you're not going to hear it, because his voice ain't on the tape. . . .

. . . . .

"Q. Sure. So it was a yes, no, situation for you in that he'd phrase it a certain way and all you had to do was yes or no?

"A. Ummm-hmmm. And then, you know, he'd say to repeat that." *Id.*, at 296–298.

[21] "A. I just want people to know. Because they shouldn't vote for a man that is this dirty, you know, because I call it blackmail, what he was trying to do." *Id.*, at 314.

There is some tension between this civic interest in fair procedure and Thompson's reluctant participation in the exposure of the corrupt pro-

and in response to the second she gave an equivocal answer,[22] even though she had previously assured Blount that Stephens would confirm everything she had said.[23]

On Sunday, October 30, an editorial appeared in the Journal News under the headline "Municipal Court Race will have More than One Loser."[24] App. to Pet. for Cert. 45a. In the column, Blount observed that the campaign "battle has been all it was expected to be and more," and predicted that "[a] lot could still happen in the next eight to nine days." *Ibid.* He went on to discuss the charges pending against New, stating that the "array of charges and counter charges probably has taken some votes from Dolan." *Ibid.* He cautioned, however, that the race was still wide open and quoted an unidentified voter as saying, "I resent voting for a person who I later find has been deceitful or dishonest

---

cedures at the Municipal Court, her assertion that although she realized that Connaughton's offers were improper, she would have accepted them if her name had never been mentioned because "that's the way [the system] works," *id.*, at 315, and her displeasure at being called a "snitch and a rat," *id.*, at 320.

[22] "A. I think she's scared right now to talk to anyone, because the Cincinnati Enquirer has been trying to get her to talk to them. She's getting scared now since this is all reality. My sister is . . . she's kind of weak-minded when it comes to anything like that. She won't do nothing for nobody unless she thinks she's benefiting from it. And she honestly thought she was a getting a job out of this, and would make something of herself out of this. And the Connaughtons just used her all the way. And now since she's seeing that it's coming down to where she ain't going to get nothing out of it, she's brought up in the middle of all this and everything, she's scared." *Id.*, at 316.

[23] "MR. BLOUNT: Obviously, we can't quote your sister from you (inaudible). What's your sister's position in this, would she support you or would she support him? In other words, if somebody said to her, who's telling the truth here?

"A. She'll tell you about the trips, the dinner at the Maisonette, the jobs and everything. She'll tell you that's the truth, because they was offered to her too." *Id.*, at 313.

[24] The full text of this editorial is reprinted as Appendix A to the Court of Appeals' opinion. 842 F. 2d, at 848–849.

in campaigning." *Id.*, at 46a. Significantly, this unidentified person did not express indignation at dishonesty in the administration of the Municipal Court—a concern one would think the arrest of New might have prompted—but rather, a distaste for dishonesty *in campaigning*—a concern that the then-uninvestigated and unwritten November 1 story would soon engender. After questioning the Cincinnati Enquirer's coverage of a story critical of Dolan and suggesting that "the Connaughton forces have a wealthy, influential link to *Enquirer* decisionmakers," the column indicated that the Journal News had not yet decided which candidate it favored, but implied that an endorsement was forthcoming. *Id.*, at 48a.

On October 31, a reporter for the Journal News telephoned Connaughton and asked him to attend a meeting with Jim Blount, stating "that the endorsement may hang in the balance." Tr. 457 (Aug. 9, 1985). Connaughton met with the reporter, Blount, and Cocozzo that afternoon and discussed a variety of subjects. One of the subjects was the rumor that Connaughton had an influential link to the Cincinnati Enquirer. Connaughton asserted that he had "no extraordinary pull or any inside track to anybody down there," and that any rumor to the contrary was "a lie." *Id.*, at 458. Another subject was Connaughton's participation in the investigation of Billy Joe New. Connaughton provided a chronology of the events that led to his filing of the complaint against New and explained that he believed that he had an obligation "as an attorney and officer of the court to report [New's] crimes." *Id.*, at 458–459. No mention was made of Thompson's interview or her charges against Connaughton. *Id.*, at 460. After about an hour, Jim Blount received a telephone call and then told Connaughton that a reporter wanted to interview him. *Id.*, at 462.

Connaughton then went to another office where Blount and Long advised him that they had interviewed Alice Thompson

and were "trying to find out . . . how much of her statement was true." App. 256. The ensuing tape-recorded interview lasted 55 minutes. Connaughton acknowledged that the meetings that Thompson described had taken place and that there had been some speculative discussion about each of the subjects that Thompson mentioned. He stated, however, that Thompson's account of their meetings was "obviously shaded and bizarre," *id.*, at 276, and that there was "absolutely" no *"quid pro quo* for information." [25]

Thus, while categorically denying that he intended to confront New and Judge Dolan with the tape of the Stephens interview to scare them into resigning, Connaughton admitted that he might well have speculated about what they would say or do if they heard the tapes. [26] Similarly, while denying

[25] The transcript of the Connaughton interview states:

"MR. CONNAUGHTON: No, and it had nothing to do with (inaudible) for information or something, i[f] that's what the point of this question is. That's absolutely no, if that's that question. Well, the tape will speak for itself." App. 265.

The tape recording of this interview makes clear that Connaughton said, "No, and it had nothing to do with a *quid pro quo* for information . . . ." Defendant's Exh. I.

[26] "A. . . . I think it would be fair to say, sometime during those three or four hours that they were there, that I probably made a remark along the lines that I just can't believe what I'm hearing, and, you know, I would think if they could hear what we're hearing, they would probably resign. I mean, I thought the allegation was that serious. But to tell her that—to answer that—and if she's saying that was my announced purpose of what I had them there for and what we were going to do with the information, my answer would be no.

"MR. BLOUNT: You didn't tell her you were going to take the tapes to him? And play them for them?

"A. No. No. What I might have said is, boy, I'd sure like to let them hear these tapes and see what they've got to say for themselves, you know, in a fashion such as that.

"MR. BLOUNT: In an expression of shock.

"MR. CONNAUGHTON: Yeah. Yeah, as I almost fell off of the fireplace. Right." App. 262–263.

that he had promised Stephens and Thompson anonymity, he agreed that he had told them that he had hoped that they could remain anonymous.[27] He also categorically denied that he had promised Thompson a job as a waitress, promised Stephens a job at the Municipal Court, or promised to set their parents up in a restaurant, although he did acknowledge a general conversation in which his wife had discussed the possibility that if her dream of opening "a gourmet ice cream shop" should materialize, the sisters might work there.[28] There were similar acknowledgments of references

---

[27] "Q. Did you ever promise Alice Thompson anonymity?
"A. That question was discussed, and I was hoping to her, and I told her it would be my intention and hope that she could remain anonymous, yes. But did I promise her anonymity, the answer would be no. Did we discuss it, we sure did, and I expressed to her my desire as well as her desire that she could remain anonymous." *Id.*, at 264.

[28] "Q. Did you ever talk to Alice about getting a job for her in appreciation for her help with your investigation of New and Dolan?
"A. No.
"Q. Not a waitress job?
"A. No.
"Q. Did you promise a Municipal Court job for her sister Patsy Stephens?
"A. No.
"Q. Did you offer to have 'the sisters go on a post election trip to Florida with you and your family to stay in a condominium?'
"A. No.
"Q. Did you offer to set up Thompson's parents, the Breedloves, in what is now Walt's Chambers, which you own and lease?
"A. Absolutely not.
"Q. Why would she say this to us?
"A. What was discussed in an off-handed way, the people who own that bar, who we're not very pleased with, their lease expires next September. My wife has the idea that she wants to open an ice cream type shop like Graeters, or some such thing as that, and I heard her discussing with them that maybe, since Patty had run this Homette Restaurant or something of that nature, that maybe she would help out and participate in the operation of this—whatever you want to call it—

to a possible Florida trip and postelection victory dinner, but denials of any promises.[29]  At the end of the interview, Long went back—stressing that Thompson's charge was a "hefty"

---

deli shop or gourmet ice cream shop.  Yes, and I was present when that took place.

"Q. And when was that?

"A. Well, I don't think it was that night.  As I recall, this was a later time that we had seen them.

"Q. But that would only be for Patty (unclear)?

"A. I guess Alice was there, and the offer may have been extended to her in that fashion, that she could work there or something—I wouldn't be surprised if that was said."  Id., at 264–265.

[29] "Q. What about this post election trip to Florida? . . .

"MR. BLOUNT: Did you talk about anything like that?

"A. Ummm-hmmm.  After getting over the initial shock it became a little clearer to me of—kind of how scary this thing was with the information they gave to us, as far as, if their personal safety was at stake . . . .  I do remember in an off-handed way it being discussed . . . they could go down to Hilton Head or Florida, or something like that, or maybe hide out or something like that, I don't know.  But I own no property and have nothing to offer them.

"Q. But there was talk about a friend that had a condominium that would be vacant and it was in terms of a full blown trip, you know, you, the Berrys, the whole group going down to Florida and they were welcome to go along. . . .

"A. No.  The only conversation I remember along those lines was in connection with, if their personal safety might be in question because of going out on the line and making these serious allegations. . . ."  Id., at 266.

"Q. One last statement.  At lunch Thompson said that you promised to take her and her sister out to a post election victory dinner at the Maisonette?

"A. I promised to take them to the Maisonette?  Hell, I haven't been to the Maisonette for years.

"MR. BLOUNT: Was it discussed? . . .

"A. It may have been.  It may have been.  I won't deny that some loose discussion in a kidding way was . . .

.         .         .          .         .

"A. . . . If she says that I made a firm statement that we were going to definitely plan a party at the Maisonette, that's not true. . . ."  Id., at 272–273.

one—and asked for a second time whether Connaughton had promised Stephens a job at the Municipal Court if he was elected. He once again unequivocally denied the allegation.[30]

The following day the lead story in the Journal News — under the headline "Bribery case witness claims jobs, trip offered"—reported that "[a] woman called to testify before the . . . Grand Jury in the Billy Joe New bribery case claims Dan Connaughton, candidate for Hamilton Municipal Judge, offered her and her sister jobs and a trip to Florida 'in appreciation' for their help."[31]   *Id.*, at 329.   The article, which carried Pam Long's byline, stated that Thompson accused Connaughton of using "'dirty tricks'" to gain her cooperation in investigating New and that Connaughton, although admitting that he did meet with Thompson, "denied any wrongdoing."   *Ibid.*   Each of Thompson's allegations was accurately reported, including her claims that Connaughton had promised to "protect her anonymity," *id.*, at 330, that he had promised Stephens "a municipal court job" and Thompson some other sort of work, that he had invited both sisters on "a post-election trip to Florida," and that he had offered "to set up Thompson's parents . . . in the restaurant business," *id.*, at 333.   The article conveyed Thompson's allegation that "the tapes were turned off and on during a session [that] lasted until 5:30 a.m.," and that these promises were

---

[30] "Q. So her sister Patty, again getting back and going over the promises—pardon me for going back to them but that seems to be a hefty charge against you.

"A. That's alright.

"Q. Her sister Patty is not going to get a job in the Municipal Court if you're elected?

"A. Not that I know of.

"Q. And she's not going to be disappointed to find that out, right?

"[A. She's not going to be disappointed at that.   Right.]"   *Id.*, at 277. The bracketed response does not appear in the written transcript, but can be heard on the tape recording.   Defendant's Exh. I.

[31] The full text of this article is reprinted as Appendix B to Judge Guy's dissenting opinion.   842 F. 2d, at 858–859.

made "[w]hen the tape was turned off." *Ibid.* In addition, Long wrote, "Thompson claimed Connaughton had told her the tapes he made of her . . . statement . . . were to be presented to Dolan" with the hope that Dolan might resign, thereby allowing Connaughton to assume the municipal judgeship. *Id.*, at 335. Connaughton's contrary version of the events was also accurately reported.

As the Court of Appeals correctly noted, there was evidence in the record—both in the Thompson tape and in the Connaughton tape—that would have supported the conclusion that Thompson was telling the truth and that Connaughton was dissembling. See 842 F. 2d, at 840. On the other hand, notwithstanding the partial confirmation of Thompson's charges in the Connaughton tape, there remained a sharp conflict between their respective versions of the critical events. There was unquestionably ample evidence in the record to support a finding that Thompson's principal charges were false, either because she misinterpreted remarks by Connaughton and his wife, or because Thompson was deliberately lying.

The jury listened to the tape recordings of the two conflicting interviews and also observed the demeanor of the two witnesses as they testified in open court. They found that Connaughton was telling the truth and that Thompson's charges were false. The fact that an impartial jury unanimously reached that conclusion does not, however, demonstrate that the Journal News acted with actual malice. Unlike a newspaper, a jury is often required to decide which of two plausible stories is correct. Difference of opinion as to the truth of a matter—even a difference of 11 to 1—does not alone constitute clear and convincing evidence that the defendant acted with a knowledge of falsity or with a "high degree of awareness of . . . probable falsity," *Garrison,* 379 U. S., at 74. The jury's verdict in this case, however, derived additional support from several critical pieces of information that strongly support the inference that the Jour-

nal News acted with actual malice in printing Thompson's false and defamatory statements.

## IV

On October 27, after the interview with Alice Thompson, the managing editor of the Journal News assembled a group of reporters and instructed them to interview all of the witnesses to the conversation between Connaughton and Thompson with one exception—Patsy Stephens. No one was asked to interview her and no one made any attempt to do so. See App. 56–57, 61, 83–85. This omission is hard to explain in light of Blount's and Long's repeated questions during the Connaughton and Thompson interviews concerning whether Stephens would confirm Thompson's allegations. See *id.*, at 277, 313, 316. It is utterly bewildering in light of the fact that the Journal News committed substantial resources to investigating Thompson's claims, yet chose not to interview the one witness who was most likely to confirm Thompson's account of the events. However, if the Journal News had serious doubts concerning the truth of Thompson's remarks, but was committed to running the story, there was good reason not to interview Stephens—while denials coming from Connaughton's supporters might be explained as motivated by a desire to assist Connaughton, a denial coming from Stephens would quickly put an end to the story.

The remaining six witnesses, including Connaughton, were all interviewed separately on October 31. Each of them denied Alice Thompson's charges and corroborated Connaughton's version of the events. Thus, one Journal News reporter testified at trial that Jeanette and Ernest Barnes denied that any promises, offers, or inducements were made and that he had known the Barneses for several years and considered them both credible. *Id.*, at 89–90. Another reporter testified that she interviewed Dave Berry and that Berry stated that absolutely no promises or offers were made. *Id.*, at 91–92. By the time the November 1 story ap-

peared, six witnesses had consistently and categorically denied Thompson's allegations, yet the newspaper chose not to interview the one witness that both Thompson and Connaughton claimed would verify their conflicting accounts of the relevant events.

The newspaper's decision not to listen to the tapes of the Stephens interview in Connaughton's home also supports the finding of actual malice. During the Connaughton interview, Long and Blount asked if they could hear the tapes. *Id.*, at 259. Connaughton agreed, *ibid.*, and later made the tapes available, *id.*, at 48, 142. Much of what Thompson had said about the interview could easily have been verified or disproved by listening to the tapes. Listening to the tapes, for example, would have revealed whether Thompson accurately reported that the tape recorders were selectively turned on and off and that Connaughton was careful not to speak while the recorders were running. Similarly, the tapes presented a simple means of determining whether Stephens and Thompson had been asked leading questions, as Thompson claimed. Furthermore, if Blount was truly in equipoise about the question whether to endorse the incumbent judge for reelection—as he indicated in the column that he published on Sunday, October 30—it is difficult to understand his lack of interest in a detailed description of the corrupt disposition of 40 to 50 cases in Judge Dolan's court. Even though he may have correctly assumed that the account did not reflect on the integrity of the judge himself, surely the question whether administrative shortcomings might be revealed by the tapes would be a matter in which an editor in the process of determining which candidate to endorse would normally have an interest.[32] Although simply one piece of

---

[32] Blount testified at trial as follows:

"Q. . . . Did you listen to any of the tapes of the interview conducted by Dan Connaughton with Miss Stephens and Miss Thompson on the 17th of September? Did you listen to any of those tapes before you approved and

evidence in a much larger picture, one might reasonably infer in light of this broader context that the decision not to listen to the tapes was motivated by a concern that they would raise additional doubts concerning Thompson's veracity.

Moreover, although also just a small part of the larger picture, Blount's October 30 editorial can be read to set the stage for the November 1 article. Significantly, this editorial appeared before Connaughton or any of the other witnesses were interviewed. Its prediction that further information concerning the integrity of the candidates might surface in the last few days of the campaign can be taken to indicate that Blount had already decided to publish Thompson's allegations, regardless of how the evidence developed and regardless of whether or not Thompson's story was credible upon ultimate reflection.

Finally, discrepancies in the testimony of Journal News witnesses may have given the jury the impression that the

---

published the article about Dan Connaughton on the figures of November 18, 1983?

"A. No, because we had from several sources what was on the tape, there was several sources including Mr. Connaughton, that there was no mention of things we were exploring at this time[.]

.          .          .          .          .

"Q. You were, I presume, concerned that you were dealing with a credible person in Alice Thompson, were you not?

"A. Correct.

"Q. Wouldn't one of the simplest ways to determine her credibility be to play the tape to see whether her statement that Dan's voice is not on it is true?

"A. No, because we had been told from other sources that this matter, as I previously said, saying it was not on the tape. This was not discussed on the tape. We had been told by other persons that the tape was junk as far as evidence.

"Q. The tape was what?

"A. Junk." App. 30–31.

Blount further testified that by the time of trial, almost two years after he received the tapes, he had only listened to 15 minutes of the 2½ hours of tape. *Id.*, at 33.

failure to conduct a complete investigation involved a deliberate effort to avoid the truth. Thus, for example, Blount's superiors testified that they understood that Blount had directed reporter Tom Grant to ask the police whether Thompson had repeated her charges against Connaughton to them and whether they considered her a credible witness. *Id.*, at 86–87 (Walker), 95 (Cocozzo). Blount also so testified. *Id.*, at 37–38. Grant, however, denied that he had been given such an assignment. *Id.*, at 88. Similarly, at the early stages of the proceeding, there was testimony that on October 31 Pam Long had tried to arrange a meeting with Patsy Stephens over the telephone, *id.*, at 94, that Blount was standing at her desk during the conversation and overheard Long talking to Stephens, *id.*, at 36–37, and that Connaughton had volunteered that he would have Stephens get in touch with them, *id.*, at 57. Connaughton categorically denied that the issue of getting in touch with Stephens was even discussed, *id.*, at 142, and ultimately Blount and Long agreed that there was no contact—and no attempt to make contact—with Stephens on the 31st or at any other time before the story was published, *id.*, at 48–49 (Blount), 56–57 (Long).

## V

The question whether the evidence in the record in a defamation case is sufficient to support a finding of actual malice is a question of law. *Bose Corp.* v. *Consumers Union of United States, Inc.*, 466 U. S., at 510–511. This rule is not simply premised on common-law tradition,[33] but on the

---

[33] The following cases are illustrative of this tradition: *Bose*, 466 U. S., at 510–511 (actual malice); *Jenkins* v. *Georgia*, 418 U. S. 153, 161 (1974) (obscenity); *Hess* v. *Indiana*, 414 U. S. 105, 108–109 (1973) *(per curiam)* (incitement); *Miller* v. *California*, 413 U. S. 15, 25 (1973) (obscenity); *Time, Inc.* v. *Pape*, 401 U. S. 279, 284 (1971) (actual malice); *Greenbelt Cooperative Publishing Assn., Inc.* v. *Bresler*, 398 U. S. 6, 11 (1970) (defamation); *Street* v. *New York*, 394 U. S. 576, 589, 592 (1969) (fighting words); *Beckley Newspapers Corp.* v. *Hanks*, 389 U. S. 81, 83 (1967) *(per curiam)* (actual malice); *New York Times Co.* v. *Sullivan*, 376 U. S. 254, 285 (1964)

unique character of the interest protected by the actual malice standard. Our profound national commitment to the free exchange of ideas, as enshrined in the First Amendment, demands that the law of libel carve out an area of "'breathing space'" so that protected speech is not discouraged. *Gertz,* 418 U. S., at 342 (quoting *NAACP* v. *Button,* 371 U. S. 415, 433 (1963)); *New York Times Co.,* 376 U. S., at 272 (same). The meaning of terms such as "actual malice"—and, more particularly, "reckless disregard"—however, is not readily captured in "one infallible definition." *St. Amant* v. *Thompson,* 390 U. S., at 730. Rather, only through the course of case-by-case adjudication can we give content to these otherwise elusive constitutional standards. *Bose, supra,* at 503. Moreover, such elucidation is particularly important in the area of free speech for precisely the same reason that the actual malice standard is itself necessary. Uncertainty as to the scope of the constitutional protection can only dissuade protected speech—the more elusive the standard, the less protection it affords. Most fundamentally, the rule is premised on the recognition that "[j]udges, as expositors of the Constitution," have a duty to "independently decide whether the evidence in the record is sufficient to cross the constitutional threshold that bars the entry of any judgment that is not supported by clear and convincing proof of 'actual malice.'" *Bose, supra,* at 511.

There is little doubt that "public discussion of the qualifications of a candidate for elective office presents what is probably the strongest possible case for application of the *New York Times* rule," *Ocala Star-Banner Co.* v. *Damron,* 401 U. S. 295, 300 (1971), and the strongest possible case for in-

---

(actual malice); *Edwards* v. *South Carolina,* 372 U. S. 229, 235 (1963) (peaceful assembly); *Niemotko* v. *Maryland,* 340 U. S. 268, 271 (1951) (failure to issue license for religious meeting in public park); *Pennekamp* v. *Florida,* 328 U. S. 331, 335 (1946) (clear and present danger to integrity of court).

dependent review. As Madison observed in 1800, just nine years after ratification of the First Amendment:

> "Let it be recollected, lastly, that the right of electing the members of the government constitutes more particularly the essence of a free and responsible government. The value and efficacy of this right depends on the knowledge of the comparative merits and demerits of the candidates for public trust, and on the equal freedom, consequently, of examining and discussing these merits and demerits of the candidates respectively." 4 J. Elliot, Debates on the Federal Constitution 575 (1861).

This value must be protected with special vigilance. When a candidate enters the political arena, he or she "must expect that the debate will sometimes be rough and personal," *Ollman* v. *Evans*, 242 U. S. App. D. C. 301, 333, 750 F. 2d 970, 1002 (1984) (en banc) (Bork, J., concurring), cert. denied, 471 U. S. 1127 (1985), and cannot " 'cry Foul!' when an opponent or an industrious reporter attempts to demonstrate" that he or she lacks the "sterling integrity" trumpeted in campaign literature and speeches, *Monitor Patriot Co.* v. *Roy*, 401 U. S. 265, 274 (1971). Vigorous reportage of political campaigns is necessary for the optimal functioning of democratic institutions and central to our history of individual liberty.[34]

---

[34] Of course, the protection of "calculated falsehoods" does not promote self-determination. As we observed in *Garrison* v. *Louisiana*, 379 U. S. 64 (1964):

"At the time the First Amendment was adopted, as today, there were those unscrupulous enough and skillful enough to use the deliberate or reckless falsehood as an effective political tool to unseat the public servant or even topple an administration. Cf. Riesman, Democracy and Defamation: Fair Game and Fair Comment I, 42 Col. L. Rev. 1085, 1088–1111 (1942). That speech is used as a tool for political ends does not automatically bring it under the protective mantle of the Constitution. For the use of the known lie as a tool is at once at odds with the premises of democratic government and with the orderly manner in which economic, social, or political change is to be effected." *Id.*, at 75.

We have not gone so far, however, as to accord the press absolute immunity in its coverage of public figures or elections. If a false and defamatory statement is published with knowledge of falsity or a reckless disregard for the truth, the public figure may prevail. See *Curtis Publishing Co.* v. *Butts,* 388 U. S., at 162 (opinion of Warren, C. J.). A "reckless disregard" for the truth, however, requires more than a departure from reasonably prudent conduct. "There must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication." *St. Amant,* 390 U. S., at 731. The standard is a subjective one—there must be sufficient evidence to permit the conclusion that the defendant actually had a "high degree of awareness of . . . probable falsity." *Garrison* v. *Louisiana,* 379 U. S., at 74. As a result, failure to investigate before publishing, even when a reasonably prudent person would have done so, is not sufficient to establish reckless disregard. See *St. Amant, supra,* at 731, 733. See also *Hunt* v. *Liberty Lobby,* 720 F. 2d 631, 642 (CA11 1983); *Schultz* v. *Newsweek, Inc.,* 668 F. 2d 911, 918 (CA6 1982). In a case such as this involving the reporting of a third party's allegations, "recklessness may be found where there are obvious reasons to doubt the veracity of the informant or the accuracy of his reports." *St. Amant, supra,* at 732.

In determining whether the constitutional standard has been satisfied, the reviewing court must consider the factual record in full. Although credibility determinations are reviewed under the clearly-erroneous standard because the trier of fact has had the "opportunity to observe the demeanor of the witnesses," *Bose,* 466 U. S., at 499–500, the reviewing court must "'examine for [itself] the statements in issue and the circumstances under which they were made to see . . . whether they are of a character which the principles of the First Amendment . . . protect,'" *New York Times Co.,* 376 U. S., at 285 (quoting *Pennekamp* v. *Florida,* 328 U. S.

331, 335 (1946)).[35]  Based on our review of the entire record, we agree with the Court of Appeals that the evidence did in fact support a finding of actual malice.  Our approach, however, differs somewhat from that taken by the Court of Appeals.

In considering the actual malice issue, the Court of Appeals identified 11 subsidiary facts that the jury "could have" found.[36]  842 F. 2d, at 843–844.  The court held that such

---

[35] Petitioner concedes that "when conducting the independent review mandated by *New York Times* and *Bose*, a reviewing court should properly hesitate to disregard a jury's opportunity to observe live testimony and assess witness credibility."  Brief for Petitioner 36, n. 45.  It contends, however, that this Court did reject the trial court's credibility determination in *Bose*.  We disagree with this reading of *Bose*.  In *Bose* we accepted the trial court's determination that the author of the report at issue did not provide credible testimony concerning the reason for his choice of words and his understanding of the meaning of the word "about."  466 U. S., at 511–512.  Unlike the District Court, however, we were unwilling to infer actual malice from the finding that the witness "refused to admit [his mistake] and steadfastly attempted to maintain that no mistake had been made—that the inaccurate was accurate."  *Id.*, at 512.

[36] The Court of Appeals asserted:

"A review of the entire record of the instant case disclosed substantial probative evidence from which a jury could have concluded (1) that the *Journal* was singularly biased in favor of Dolan and prejudiced against Connaughton as evidenced by the confidential personal relationship that existed between Dolan and Blount, the *Journal* Editorial Director, and the unqualified, consistently favorable editorial and daily news coverage received by Dolan from the *Journal* as compared with the equally consistently unfavorable news coverage afforded Connaughton; (2) that the *Journal* was engaged in a bitter rivalry with the *Cincinnati Enquirer* for domination of the greater Hamilton circulation market as evidenced by Blount's vituperous public statements and criticism of the *Enquirer;* (3) that the *Enquirer*'s initial expose of the questionable operation of the Dolan court was a high profile news attraction of great public interest and notoriety that had 'scooped' the *Journal* and by Blount's own admission was the most significant story impacting the Connaughton-Dolan campaign[;] (4) that by discrediting Connaughton the *Journal* was effectively impugning the *Enquirer* thereby undermining its market share of the Hamilton area; (5) that Thompson's emotional instability coupled with her obviously vin-

findings would not have been not clearly erroneous, *id.*, at 844, and, based on its independent review, that when considered cumulatively they provide clear and convincing evidence of actual malice, *id.*, at 847. We agree that the jury *may* have found each of those facts, but conclude that the case should be decided on a less speculative ground. Given the trial court's instructions, the jury's answers to the three special interrogatories, and an understanding of those facts not in dispute, it is evident that the jury *must* have rejected (1) the testimony of petitioner's witnesses that Stephens was not contacted simply because Connaughton failed to place her in touch with the newspaper; (2) the testimony of Blount that he did not listen to the tapes simply because he thought they would provide him with no new information; and (3) the testimony of those Journal News employees who asserted that they believed Thompson's allegations were substantially true. When these findings are considered alongside the undisputed

---

dictive and antagonistic attitudes toward Connaughton as displayed during an interview on October 27, 1983, arranged by Billy New's defense attor-. ney, afforded the *Journal* an ideal vehicle to accomplish its objectives; (6) that the *Journal* was aware of Thompson's prior criminal convictions and reported psychological infirmities and the treatment she had received for her mental condition; (7) that every witness interviewed by *Journal* reporters discredited Thompson's accusations; (8) that the *Journal* intentionally avoided interviewing Stephens between October 27, 1983, the date of its initial meeting with Thompson, and November 1, 1983 when it printed its first story even though it knew that Stephens could either credit or discredit Thompson's statements; (9) that the *Journal* knew that publication of Thompson's allegations charging Connaughton with unethical conduct and criminal extortion and her other equally damaging statements would completely discredit and irreparably damage Connaughton personally, professionally and politically; (10) that its prepublication legal review was a sham; (11) that the *Journal* timed the release of the initial story so as to accommodate follow-up stories and editorial comments in a manner calculated to peak immediately before the election in an effort to maximize the effect of its campaign to discredit Connaughton and the *Enquirer*." 842 F. 2d, at 843–844.

evidence, the conclusion that the newspaper acted with actual malice inexorably follows.

There is no dispute that Thompson's charges had been denied not only by Connaughton, but also by five other witnesses before the story was published. Thompson's most serious charge—that Connaughton intended to confront the incumbent judge with the tapes to scare him into resigning and otherwise not to disclose the existence of the tapes — was not only highly improbable, but inconsistent with the fact that Connaughton had actually arranged a lie detector test for Stephens and then delivered the tapes to the police. These facts were well known to the Journal News before the story was published. Moreover, because the newspaper's interviews of Thompson and Connaughton were captured on tape, there can be no dispute as to what was communicated, nor how it was said. The hesitant, inaudible, and sometimes unresponsive and improbable tone of Thompson's answers to various leading questions raise obvious doubts about her veracity. Moreover, contrary to petitioner's contention that the prepublication interview with Connaughton confirmed the factual basis of Thompson's statements, Brief for Petitioner 47, review of the tapes makes clear that Connaughton unambiguously denied each allegation of wrongful conduct. Connaughton's acknowledgment, for instance, that his wife may have discussed with Stephens and Thompson the possibility of working at an ice cream store that she might someday open, hardly confirms the allegations that Connaughton had promised to buy a restaurant for the sister's parents to operate, that he would provide Stephens with a job at the Municipal Court, or even that he would provide Thompson with suitable work.[37] It is extraordinarily unlikely that the

---

[37] Nor can petitioner claim immunity from suit because portions of Thompson's account of the relevant events were confirmed by Connaughton. "[T]he defamer may be [all] the more successful when he baits the hook with truth." *Afro-American Publishing Co.* v. *Jaffe*, 125 U. S. App. D. C. 70, 76, 366 F. 2d 649, 655 (1966) (en banc). See also *Tavoulareas*,

reporters missed Connaughton's denials simply because he confirmed certain aspects of Thompson's story.

It is also undisputed that Connaughton made the tapes of the Stephens interview available to the Journal News and that no one at the newspaper took the time to listen to them. Similarly, there is no question that the Journal News was aware that Patsy Stephens was a key witness and that they failed to make any effort to interview her. Accepting the jury's determination that petitioner's explanations for these omissions were not credible, it is likely that the newspaper's inaction was a product of a deliberate decision not to acquire knowledge of facts that might confirm the probable falsity of Thompson's charges. Although failure to investigate will not alone support a finding of actual malice, see *St. Amant*, 390 U. S., at 731, 733, the purposeful avoidance of the truth is in a different category.

There is a remarkable similarity between this case—and in particular, the newspaper's failure to interview Stephens and failure to listen to the tape recording of the September 17 interview at Connaughton's home—and the facts that supported the Court's judgment in *Curtis Publishing Co.* v. *Butts*, 388 U. S. 130 (1967). In *Butts* the evidence showed that the Saturday Evening Post had published an accurate account of an unreliable informant's false description of the Georgia athletic director's purported agreement to "fix" a college football game. Although there was reason to question the informant's veracity, just as there was reason to doubt Thompson's story, the editors did not interview a witness who had the same access to the facts as the informant and did not look at films that revealed what actually hap-

---

260 U. S. App. D. C., at 64, 817 F. 2d, at 787. Of course, the press need not accept "denials, however vehement; such denials are so commonplace in the world of polemical charge and countercharge that, in themselves, they hardly alert the conscientious reporter to the likelihood of error." *Edwards* v. *National Audubon Society, Inc.*, 556 F. 2d, at 121.

pened at the game in question.[38] This evidence of an intent to avoid the truth was not only sufficient to convince the plurality that there had been an extreme departure from professional publishing standards, but it was also sufficient to satisfy the more demanding *New York Times* standard applied by Chief Justice Warren,[39] JUSTICE BRENNAN, and JUSTICE WHITE.[40]

As in *Butts*, the evidence in the record in this case, when reviewed in its entirety, is "unmistakably" sufficient to support a finding of actual malice. The judgment of the Court of Appeals is accordingly

*Affirmed.*

---

[38] As Justice Harlan observed in *Butts:*

"Burnett's notes were not even viewed by any of the magazine's personnel prior to publication. John Carmichael who was supposed to have been with Burnett when the phone call was overheard was not interviewed. No attempt was made to screen the films of the game to see if Burnett's information was accurate, and no attempt was made to find out whether Alabama had adjusted its plans after the alleged divulgence of information." 388 U. S., at 157.

In this passage, "Stephens" might easily be substituted for "Carmichael," "Thompson" for "Burnett," and "the tapes" for "Burnett's notes" and "the films of the game."

[39] Chief Justice Warren wrote:

"The slipshod and sketchy investigatory techniques employed to check the veracity of the source and the inferences to be drawn from the few facts believed to be true are detailed at length in the opinion of MR. JUSTICE HARLAN. Suffice it to say that little investigative effort was expended initially, and no additional inquiries were made even after the editors were notified by respondent and his daughter that the account to be published was absolutely untrue. Instead, the Saturday Evening Post proceeded on its reckless course with full knowledge of the harm that would likely result from publication of the article." *Id.*, at 169–170.

[40] Although concluding that the case should be remanded for a new trial, JUSTICE BRENNAN, joined by JUSTICE WHITE, agreed with Chief Justice Warren that the evidence presented at the original trial "unmistakably would support a judgment for Butts under the *New York Times* standard." *Id.*, at 172.

JUSTICE WHITE, with whom THE CHIEF JUSTICE joins, concurring.

In my view, in cases like this the historical facts—*e. g.*, who did what to whom and when—are reviewable only under the clearly-erroneous standard mandated by Federal Rule of Civil Procedure 52. Credibility determinations fall in this category, as does the issue of knowledge of falsity. But as I observed in dissent in *Bose Corp.* v. *Consumers Union of United States, Inc.*, 466 U. S. 485, 515 (1984), the reckless disregard component of the *New York Times Co.* v. *Sullivan* "actual malice" standard is not a question of historical fact. A trial court's determination of that issue therefore is to be reviewed independently by the appellate court.

As I read it, the Court's opinion is consistent with these views, and—as JUSTICE KENNEDY observes—is consistent with the views expressed by JUSTICE SCALIA in his concurrence. Based on these premises, I join the Court's opinion.

JUSTICE BLACKMUN, concurring.

I agree with the majority's analysis and with the result it reaches. I write separately, however, to stress two points.

First, the case reaches us in an odd posture, one which stands in the way of giving full consideration to aspects of the content of the article under attack that perhaps are of constitutional significance. Petitioner has abandoned the defense of truth, see *Philadelphia Newspapers, Inc.* v. *Hepps*, 475 U. S. 767 (1986), despite the fact that there might be some support for that defense. We therefore must presume that the jury correctly found that the article was false, see *ante*, at 681, and decide whether petitioner acted with knowledge or reckless disregard of its falsity. In addition, petitioner has eschewed any reliance on the "neutral reportage" defense. Cf. *Edwards* v. *National Audubon Society, Inc.*, 556 F. 2d 113, 120 (CA2), cert. denied, 434 U. S. 1002 (1977). This strategic decision appears to have been unwise in light of the facts of this case. The article accurately reported

newsworthy allegations that Daniel Connaughton, a political candidate, had used "dirty tricks" to elicit information from Alice Thompson and her sister, information that had become central to the political campaign, and also accurately reported Connaughton's response, which confirmed the existence of discussions with Thompson that touched upon the subject matter of her allegations but claimed that Thompson's version of these discussions was incorrect. Were this Court to adopt the neutral reportage theory, the facts of this case arguably might fit within it. That question, however, has also not been squarely presented.

Second, I wish to emphasize that the form and content of the story are relevant not only to the falsity and neutral reportage questions, but also to the question of actual malice. In the past, this Court's decisions dealing with actual malice have placed considerable emphasis on the manner in which the allegedly false content was presented by the publisher. See *Greenbelt Cooperative Publishing Assn., Inc.* v. *Bresler*, 398 U. S. 6, 12–13 (1970) (truthful and accurate reporting of what was said at public meeting on issues of public importance not actionable); *Time, Inc.* v. *Pape*, 401 U. S. 279, 290–292 (1971) (erroneous interpretation of Government report not "actual malice"). Under our precedents, I find significant the fact that the article in this case accurately portrayed Thompson's allegations *as* allegations, and also printed Connaughton's partial denial of their truth. The form of the story in this case is markedly different from the form of the story in *Curtis Publishing Co.* v. *Butts*, 388 U. S. 130 (1967), where the informant's description of the events was presented as truth rather than as contested allegations. These differences in presentation are relevant to the question whether the publisher acted in reckless disregard of the truth: presenting the content of Thompson's allegations as though they were established fact would have shown markedly less regard of their possible falsity.

Several aspects of the majority's opinion in this case might be interpreted as breaking with our practice of considering the form and content of the article in making malice determinations. The majority notes the form of the story, see *ante*, at 680–681, but its account of the evidence it finds probative of actual malice, *ante*, at 682–685, deals exclusively with evidence extrinsic to the story itself. The absence of any discussion of *Pape* and *Bresler* also might be understood as a suggestion that the manner in which the contested statements are presented is irrelevant to the malice inquiry. Finally, the majority relies upon *Butts* in the course of its discussion of petitioner's purposefully incomplete investigation of its story, *ante*, at 692–693, in a manner that suggests it might not have accorded significance to the difference between the forms of the respective stories in *Butts* and in this case.

I am confident, however, that these aspects of the majority's opinion are omissions in explanation rather than in analysis, and that the majority's opinion cannot fairly be read to hold that the content of the article is irrelevant to the actual malice inquiry. Because I am convinced that the majority has considered the article's content and form in the course of its painstaking "review of the entire record," see *ante*, at 689, and because I conclude that the result the majority reaches is proper even when the contents of the story are given due weight, I concur.

JUSTICE KENNEDY, concurring.

I join the opinion of the Court, for in my view it is not inconsistent with the analysis set out in JUSTICE SCALIA's separate concurrence.

JUSTICE SCALIA, concurring in the judgment.

I agree with the Court's disposition of this case, and with its resolution of the second legal issue on which we granted certiorari, namely whether "highly unreasonable conduct constituting an extreme departure from ordinary standards of investigation and reporting" is alone enough to establish

(rather than merely evidence of) the malice necessary to assess liability in public figure libel cases.

I disagree, however, with the Court's approach to resolving the first and most significant question upon which certiorari was granted, which was the following:

> "Whether, in a defamation action instituted by a candidate for public office, the First and Fourteenth Amendments obligate an appellate court to conduct an independent review of the entire factual basis for a jury's finding of actual malice—a review that examines both the subsidiary facts underlying the jury's finding of actual malice and the jury's ultimate finding of actual malice itself."

That question squarely raised the conflict that the Sixth Circuit perceived it had created with an earlier decision of the District of Columbia Circuit, en banc, concerning the requirement we set forth in *Bose Corp.* v. *Consumers Union of United States, Inc.*, 466 U. S. 485 (1984), that judges "exercise independent judgment" on the question "whether the record establishes actual malice with convincing clarity," *id.*, at 514. The nub of the conflict, which is of overwhelming importance in libel actions by public figures, is whether this means, as the Sixth Circuit understood the District of Columbia Circuit to have held in *Tavoulareas* v. *Piro*, 260 U. S. App. D. C. 39, 817 F. 2d 762 (1987) (en banc), that the trial judge and reviewing courts must make their own "independent" assessment of the facts allegedly establishing malice; or rather, as the Sixth Circuit held here (explicitly rejecting *Tavoulareas*), that they must merely make their own "independent" assessment that, *assuming all of the facts that could reasonably be found in favor of the plaintiff were found in favor of the plaintiff*, clear and convincing proof of malice was established.

Today's opinion resolves this issue in what seems to me a peculiar manner. The Court finds it sufficient to decide the present case to accept, not all the favorable facts that the

jury *could reasonably* have found, but rather only the adequately supported favorable facts that the jury *did* find. Exercising its independent judgment just on the basis of those facts (and the uncontroverted evidence), it concludes that malice was clearly and convincingly proved. The crucial passage of the Court's opinion is the following:

> "Given the trial court's instructions, the jury's answers to the three special interrogatories, and an understanding of those facts not in dispute, it is evident that the jury *must* have rejected (1) the testimony of petitioner's witnesses that Stephens was not contacted simply because Connaughton failed to place her in touch with the newspaper; (2) the testimony of Blount that he did not listen to the tapes simply because he thought they would provide him with no new information; and (3) the testimony of those Journal News employees who asserted that they believed Thompson's allegations were substantially true. When these findings are considered alongside the undisputed evidence, the conclusion that the newspaper acted with actual malice inextricably follows." *Ante*, at 690–691 (emphasis in original).

This analysis adopts the most significant element of the Sixth Circuit's approach, since it accepts the jury's determination of at least the necessarily found controverted facts, rather than making an independent resolution of that conflicting testimony. Of course the Court examines the evidence pertinent to the jury determination—as a reviewing court always must—to determine that the jury *could reasonably* have reached that conclusion. But the Court does not purport to be exercising its own independent judgment as to whether Stephens was not contacted simply because Connaughton failed to place her in touch with the newspaper, whether Blount did not listen to the tapes because he thought they would provide no new information, or whether the Journal News employees believed Thompson's allegations to be substantially true.

While I entirely agree with this central portion of the Court's analysis, I do not understand the Court's approach in conducting that analysis only on the basis of the three factual determinations the Court selects. To begin with, I am dubious of the Court's conclusion that the jury *must* have made all three of those findings in order to bring in the verdict that it did under the judge's instructions, and in order to answer as it did the only relevant "special interrogatory," which was "Do you unanimously find by clear and convincing proof that the publication in question was published with actual malice?" It seems to me, for example, that even if one believed Blount's explanation of why he did not listen to the tapes, it would still be reasonable to find (and I would find) clear and convincing proof of malice from the utterly inexplicable failure to interview Stephens plus the uncontroverted evidence.

More important, however, even if each of these factual findings happened to be *necessary* to the verdict and interrogatory response, I see no reason to make them the exclusive focus of our analysis, instead of consulting (as the Sixth Circuit did, and as courts invariably do when reviewing jury verdicts) all the reasonably supported findings that the jury could have made. It may well be true that "we need only consider those factual findings that were essential to the jury verdict" in the sense that referring to those alone is enough to decide the case—*i. e.*, those alone establish clear and convincing proof of malice. But one could pick out any number of categories of permissible jury findings that would meet that test. For example, it might be true that we could find the requisite proof of malice by considering, not all the evidence in its light most favorable to the plaintiff, but only that evidence produced by a particular witness. We could then say "we need only consider the findings the jury might have made based on the testimony of Mr. Smith to decide this case." I see no more logic in limiting the inquiry the way the Court has done than in limiting it in this latter fashion.

That can be made plain by applying the Court's approach to a situation in which the facts essential to the jury verdict happen *not* to establish clear and convincing proof of malice. Assume a case in which there are innumerable controverted allegations, dozens of which, if the plaintiff's version is credited, would suffice to establish malice; but in which only *one* controverted allegation—the defendant's allegation that he knew firsthand the truth of the libelous charges—could not *possibly* have been found against the plaintiff if the jury was to come in with the verdict that it did. If we applied today's analysis to that situation, we would then proceed to ask whether the fact that the defendant did not know firsthand the truth of the charges, and that he lied about that, is alone enough to establish clear and convincing proof of malice. It clearly would not be. Surely, however, we would not reverse the judgment for the plaintiff, when dozens of other disputed contentions which the jury might have resolved in the plaintiff's favor *would* establish clear and convincing proof. We would, as the Sixth Circuit did, assume that all those disputes were resolved in the plaintiff's favor—unless, of course, we again devised some nonfunctional category of the remaining disputes that we could look to, perhaps those pertaining to testimony by Mr. Smith.

In sum, while the Court's opinion is correct insofar as the critical point of deference to jury findings is concerned, I see no basis for consulting only a limited number of the permissible findings. I would have adopted the Sixth Circuit's analysis in its entirety, making our independent assessment of whether malice was clearly and convincingly proved on the assumption that the jury made all the supportive findings it reasonably could have made. That is what common-law courts have always done, and there is ultimately no alternative to it.