**UNPUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

BRENCO, INCORPORATED; FULL SPEED
AHEAD REBUILDING, INCORPORATED;
QUALITY BEARING SERVICE OF
KENTUCKY, INCORPORATED; QUALITY
BEARING SERVICE OF MISSOURI,
INCORPORATED; QUALITY BEARING
SERVICE OF CALIFORNIA,

INCORPORATED,
Plaintiffs-Appellants,

v.

ROLLER BEARING INDUSTRIES,
INCORPORATED,
Defendant-Appellee.

No. 95-1277

BRENCO, INCORPORATED; FULL SPEED
AHEAD REBUILDING, INCORPORATED;
QUALITY BEARING SERVICE OF
KENTUCKY, INCORPORATED; QUALITY
BEARING SERVICE OF MISSOURI,
INCORPORATED; QUALITY BEARING
SERVICE OF CALIFORNIA,

INCORPORATED,
Plaintiffs-Appellees,

v.

ROLLER BEARING INDUSTRIES,
INCORPORATED,
Defendant-Appellant.

No. 95-1792

Appeals from the United States District Court
for the Eastern District of Virginia, at Richmond.
Richard L. Williams, Senior District Judge.
(CA-94-388)

Argued: June 3, 1996

Decided: July 23, 1996

Before RUSSELL, HALL, and LUTTIG, Circuit Judges.

_____

Affirmed by unpublished per curiam opinion.

_____

**COUNSEL**

**ARGUED:** Craig Thomas Merritt, CHRISTIAN, BARTON, EPPS, BRENT & CHAPPELL, Richmond, Virginia, for Appellants. Stephen Earl Baril, WILLIAMS, MULLEN, CHRISTIAN & DOBBINS, Richmond, Virginia, for Appellee. **ON BRIEF:** Paul W. Jacobs, II, John W. Montgomery, Jr., CHRISTIAN, BARTON, EPPS, BRENT & CHAPPELL, Richmond, Virginia, for Appellants. Curtis M. Hairston, Jr., WILLIAMS, MULLEN, CHRISTIAN & DOBBINS, Richmond, Virginia, for Appellee.

_____

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

_____

**OPINION**

PER CURIAM:

Brenco, Inc., and several of its subsidiaries appeal final judgments entered in favor of defendant Roller Bearing Industries (RBI) on Brenco's Lanham Act, fraud, and unfair competition claims and on RBI's counterclaim for defamation. RBI cross-appeals the denial of its request for attorneys' fees as the prevailing party on the Lanham Act claim. We affirm in all respects.

2

I.

Brenco is one of only two manufacturers of roller bearings for rail-road cars in the United States. The other manufacturer, Timken, Inc., is not involved in this suit. Roller bearings, as the name implies, bear the weight of railroad cars and simultaneously provide relatively friction-free rolling motion for the axles. A typical freight car has eight roller bearings, so there are many millions in use.

When a roller bearing wears out, it can often be salvaged through reconditioning or, if extensive repairs are needed, remanufacturing. The plaintiffs other than Brenco itself are its subsidiaries that engage in reconditioning and authorized remanufacturing.

Comprehensive quality and safety standards for roller bearings are set by an industry group, the Association of American Railroads ("AAR"), in its Roller Bearing Manual. The AAR standards govern the reconditioning and remanufacturing of used roller bearings. Two AAR rules are of significance here. First, only the original manufac-turer or its authorized representative may remanufacture the "outer ring" or roller assembly, or repair and reassemble the cone assembly and its surrounding "cage." Second, a "shop code" and date must be marked on each bearing every time it is reconditioned or remanufac-tured. These markings are intended to assure accountability in the event a reconditioned or remanufactured bearing fails in service.

In 1980, Brenco's President, Stewart Johnson, and Executive Vice President, Jack Miller, left the company and formed RBI. RBI is a reconditioner only. It is not authorized to remanufacture bearings.

There has been bad blood between Brenco and RBI from the very beginning. According to Donald Lacy, then Brenco's Assistant Vice President for Sales,[1] the company's initial response to the defections of its top executives was to buy up all the second-hand reconditioning equipment in the market so that RBI could not have it. In 1983, Brenco accused RBI of "dumping" new foreign-built bearings in the U.S. market. RBI was exonerated. Lesser squabbles have continued

_____

[1] Lacy later left Brenco for RBI, where he ultimately rose to the office of President.

3

over the years, as was testified to by Miller and by a mutual customer, Thad Schipereitt of CSX Transportation.

In 1992, RBI complained that it had received a defective batch of bearings from Brenco. It inspected the product by opening three of the caged cone assemblies, and, when it returned the defective product to Brenco, it placed wire fasteners on the opened cages to hold them together.

Brenco then accused RBI of opening and closing the caged cone assemblies, which the AAR rules reserved to the manufacturer alone. The AAR thoroughly investigated Brenco's complaint and found nothing amiss. By letter dated May 26, 1993, it informed Brenco of this conclusion.

Brenco did not drop the matter, though. It hired a private investigator, who began contacting ex-RBI employees. Sure enough, the investigator found a few former employees who accused RBI of performing AAR-prohibited remanufacturing of bearings and forging Brenco marks on the work. Brenco also obtained expert opinion that certain Brenco-marked remanufacturing had been done on RBI equipment.

Armed with this evidence, Brenco went back to the AAR in May 1994. After further engineering and data review, the AAR was still unable to conclude that RBI had broken its rules.

On June 16, 1994, Brenco filed this suit charging RBI with violations of the Lanham Act[2] and adding common-law claims of fraud and unfair competition. It then mailed a copy of the complaint, along with a cover letter entitled "Notice to Users," to the chief mechanical or purchasing officers of all major domestic railroads. This "Notice" asserted, among other things, that "for at least ten years, [RBI] routinely remanufactured bearing components in violation of [AAR] rules." These violations were allegedly "carried out in secret, with a deliberate intent to deceive the original bearing manufacturers, railroad industry customers, and the AAR's Mechanical Inspection Divi-

_____

[2] 15 U.S.C. §§ 1051-1128.

sion," and they could "seriously impair the reliability of the bearings." According to the "Notice," RBI's piracy also extended to "other original bearing manufacturers."

RBI, which had not yet been served and had no idea the lawsuit had been filed, was soon deluged with irate phone calls. According to trial testimony, it literally had to beg to keep some of its customers.

RBI filed a host of counterclaims, most alleging antitrust theories. It also pled a common-law defamation claim based upon the allegations in the "Notice to Users."

After a trial, the jury found for RBI on all of Brenco's claims and for Brenco on all of RBI's claims save one: it held for RBI on its defamation claim and awarded $374,150 plus interest. Judgment was entered on the jury's verdict.

As the prevailing defendant in the Lanham Act case, RBI moved for an award of attorneys' fees and costs. The district court, applying this court's Scotch Whisky standard, denied the motion.

Brenco appeals, and RBI cross-appeals the denial of fees.

II.

After several hours of deliberations, the jury sent a question to the court:

> Does Stipulation Number 35 release Brenco from legal liability in the event that RBI reconditioned the bearing last in the event of a malfunction?

Stipulation 35 reads:

> The purpose of the rules in the Roller Bearing Manual with respect to marking is to assure accountability for the work that has been performed in that particular operation, and to place responsibility for failure with those who performed the work.

5

The district court answered the question as follows:

> Now, the Roller Bearing Manual in effect says whoever reconditions the bearing has to put a mark on the bearing so that you can identify who did the reconditioning. Now, the purpose of that is so that the entity that bought that bearing that has been reconditioned can look, if there was a malfunction at that point in time, they would look to the reconditioner for damages or a replacement. But if RBI had done the reconditioning, and when they inspected the bearing and saw that whatever malfunction came about was due to a manufacturing defect in the bearing itself, then RBI could implead Brenco and say, look, while we reconditioned this thing the actual culprit was your manufacturing of it so, therefore, you owe us money on it.
>
> Now, if the malfunction was due to something that RBI did wrong, then that would end the matter and Brenco wouldn't have any liability for that. Does that clear it up?
>
> Then, your next question was, does accountability in this stipulation mean liability? And they are sort of interchangeable, but accountability is so that the customer who bought the reconditioned bearing knows who [sic] to go to get a new bearing or money back in his pocket.

One juror then asked if the situation would be different if a malfunction caused death or injury. The court replied:

> Well, then, a third party or the victim could sue RBI and collect damages, or they would sue the railroad first and then the railroad that had bought the bearing would bring RBI in and probably Brenco, and if they determined that the failure was due to bad reconditioning, probably the railroad would be able to stick it to RBI. If they found that it was a manufacturing defect then the railroad would be able to pass the liability on to Brenco. But the victim would get paid, certainly, so it would work both ways.

6

Subsequently, out of the hearing of the jury, the court asked whether either side had any problem with these instructions. Counsel for Brenco complained that the jury might misunderstand the court's comments as meaning that RBI would somehow be responsible for its reconditioning errors even if it had managed to forge a Brenco mark on the bearing and the forgery were not detected. The district court replied that the jury's question rested on the assumption that the proper marks were there; the court therefore declined to further supplement the instructions.

The form and content of supplemental instructions are within the district court's discretion, and are reviewed for abuse of that discretion. Price v. Glosson Motor Lines, Inc., 509 F.2d 1033, 1036 (4th Cir. 1975).**3**

We see no abuse. If the challenged instructions were wholly divorced from context, there might be some palpable risk that the jury misunderstood them in the manner Brenco suggests. With context restored, there is no such risk. The jury was asking about the meaning of stipulation 35, which explained the purpose of the marks. The district court prefaced its explanation with the observation that a railroad could look to the marks to see whom it should hold responsible for bearing failure. We will not lightly presume that the jurors were so dull-witted as to fail to perceive that forging the marks would cause the railroad to look to the wrong entity.

_____

**3** Perhaps in hopes of receiving the benefit of a more exacting appellate inquiry, Brenco characterizes the court's answers to the jury's inquiry as "comments on the evidence." Though the court used the parties' names in its answer, it did so in a purely hypothetical and illustrative sense, and we are satisfied that the court did not stray from an exegesis on the law into a commentary on the facts. We treat the court's responses, therefore, as supplemental instructions.

In any event, even if we viewed the court's answers as comments on the evidence, we would hold, for the reasons stated in the main text, that they neither mischaracterized the evidence nor misled the jury in a manner prejudicial to Brenco.

7

III.

Brenco also asserts that it was entitled to judgment as a matter of law on RBI's defamation counterclaim. We disagree.

To prevail on its counterclaim, RBI had to prove by clear and convincing evidence that the Brenco "Notice to Users" was false and defamatory. Brenco concedes that the notice was defamatory, i.e. it tended to harm RBI's business reputation. Falsity was at issue, and the jury obviously found that RBI had not engaged in the conduct alleged.

Nevertheless, even where his statement is false and defamatory, a speaker in Virginia has a qualified privilege to comment in good faith on matters in which he and his listener have a mutual interest or duty. Smalls v. Wright, 241 Va. 52, 399 S.E.2d 805, 807 (1991). The district court properly instructed the jury that Brenco was entitled to assert the qualified privilege. It went on to instruct the jury, however, that Brenco could lose the protection of the qualified privilege if --

> (1) Brenco made the statement knowing it was false or with reckless disregard to its truth or falsity (identical to the federal "malice" standard);[4]

> (2) the statement was deliberately made in a manner in which it would be published to persons with no interest in the subject;

> (3) the statement was unnecessarily insulting;

> (4) the language used was stronger or more violent than was necessary; or

> (5) the motive for the statement was hatred, ill will, or a desire to harm RBI, rather than as a fair comment on the subject.

_____

[4] **See Harte-Hanks Communications, Inc. v. Connaughton**, 491 U.S. 657, 667 (1989).

8

In Virginia, whether a speaker with a qualified privilege has abused and thereby lost it is a question for the jury. Smalls, 399 S.E.2d at 808. Viewing de novo the evidence in the light most favorable to RBI, as we must,[5] we conclude that there was sufficient evidence to submit this issue to the jury and to support its verdict.

IV.

The district court instructed the jury that Brenco had to prove its common-law unfair competition claim by clear and convincing evidence. Brenco asserts that this heightened standard is erroneous, citing a Virginia case closely on point -- involving, as here, alleged unauthorized use of a trade name -- that required proof by "a fair preponderance of the evidence." Rosso & Mastracco, Inc. v. Giant Food Shopping Center of Virginia, Inc., 200 Va. 159, 104 S.E.2d 776, 780 (1958). RBI counters that because Brenco's theory here is more akin to fraud than to simple trademark infringement, [6] the "clear, cogent, and convincing evidence" standard applicable to common-law fraud claims[7] should apply.

We need not decide whether a Virginia court would apply Rosso & Mastracco here or adopt RBI's analogy, because any error is clearly harmless. The Lanham Act claim is similar yet narrower than the state unfair competition claim,[8] and the burden of proof there is

_____

[5] **Smith v. Barry**, 985 F.2d 180, 184 (4th Cir.), cert. denied, 114 S.Ct. 207 (1993).
[6] For example, the dispute in Rosso & Mastracco was whether the plaintiffs had established that their use of the word "Giant" had acquired a secondary meaning that could engender consumer confusion.
[7] **See Patrick v. Summers**, 235 Va. 452, 369 S.E.2d 162, 164 (1988).
[8] The district court instructed the jury that the Lanham Act claim had three elements: (i) that RBI sold bearings containing components that purchasers would believe had not been remanufactured except by Brenco; (ii) that RBI had remanufactured those components; and (iii) that RBI failed to inform the buyers that it had engaged in such remanufacturing. The unfair competition claim required proof that (i) RBI sold bearings in a manner likely to confuse purchasers of the source of any remanufacturing work that had been performed; (ii) the buyers were deceived by RBI; (iii) RBI profited from the sale; and (iv) Brenco was

9

a mere preponderance. The jury found for RBI. Moreover, the defamation verdict establishes that the "Notice to Users" was false. In light of these verdicts, the jury would not possibly have held for Brenco on the unfair competition claim, even under a lesser burden of proof.

V.

In Lanham Act cases, attorneys' fees are available in "exceptional" cases. 15 U.S.C. § 1117(a). This court, in reliance on legislative history, has given "exceptional" a different meaning depending on whether the plaintiff or defendant prevails. A prevailing plaintiff must prove bad faith on the defendant's part, but a prevailing defendant may receive an award on a showing of "something less." Scotch Whisky Ass'n v. Majestic Distilling Co., Inc., 958 F.2d 594, 599-600 (4th Cir.), cert. denied, 506 U.S. 862 (1992). The district court's decision on a Lanham Act fee application is reviewed for abuse of discretion. Shell Oil Co. v. Commercial Petroleum, Inc., 928 F.2d 104, 108 n.6 (4th Cir. 1991).

The court reasoned that Brenco's Lanham Act claim, though it failed, was not "unfounded," and awarding fees here would be tantamount to automatic fee-shifting, which it deemed incompatible with the statute's limitation of fees to "exceptional" cases. This reasoning falls well within the broad discretion entrusted to the district courts in Scotch Whisky.**9**

_____

damaged. Thus, at least under Brenco's theory of the case here, a Lanham Act violation would not necessarily constitute unfair competition, but no instance of unfair competition could occur without a subsumed violation of the Lanham Act.

**9** We recognize that Scotch Whisky's dual standard was called into considerable doubt by disapproving dicta in Fogerty v. Fantasy, Inc., 114 S.Ct. 1023, 1028-1029 n.12 (1994). The same test-- be it bad faith or "something less" -- may well apply to applications for fees from both plaintiff and defendant. In any event, because RBI has not made even the "something less" showing here, the continuing vitality of the Scotch Whisky standard need not be decided.

10

The judgment of the district court is affirmed.

<u>AFFIRMED</u>

11