**ETHLYN JOSEPH, Plaintiff**

**v.**

**THE DAILY NEWS PUBLISHING COMPANY, INC., LEE WILLIAMS, JANE LOWE DAVIS, SINCLAIR CRABB, Defendants**

Case No. SX-04-CV-499

Superior Court of the Virgin Islands

Division of St. Croix

January 21, 2009

LEE J. ROHN, ESQ., Christiansted, USVI, *Attorney for Plaintiff.*

PAUL RUSKIN, ESQ., Christiansted, USVI, *Attorney for Defendants.*

KEVIN A. RAMES, ESQ., Christiansted, USVI, *Attorney for Defendants.*

D'ERAMO, *Judge*

## Memorandum Opinion on Motion for Summary Judgment

(January 21, 2009)

Before the Court is the Motion for Summary Judgment of Defendants, the Daily News and Jane Lowe Davis, filed July 25, 2007. An Opposition

was filed March 7, 2008, to which Defendants replied on April 2, 2008. For the following reasons, Defendants' motion is GRANTED.

## Facts

This case arises from a series of articles published by the Daily News from March 23 to 31, 2004, alleging corrupt practices by Plaintiff Ethlyn Joseph in her capacity as Director of Environmental Health for the Government of the Virgin Islands' Department of Health. Plaintiff has filed a four-count complaint alleging the following: Defamation, slander, and libel *per se* (Count I); Breach of the duty of good faith (Count II); negligent infliction of emotional distress (Count III); and Punitive Damages (Count IV).

The articles are reproduced in Defendant's Exhibit 2 to their Motion. It is undisputed that Ethlyn Joseph was a public official at the time of the publication of the articles.[1]

## Standard for Summary Judgment

This case is before the Court on a Motion for Summary Judgment. Since the plaintiff was a public official at all relevant times, and the Complaint alleges defamation, the Motion must be analyzed in light of certain First Amendment considerations, *see New York Times Co. v. Sullivan*, 376 U.S. 254, 84 S. Ct. 710, 11 L. Ed. 2d 686 (1964). However, the basic law of summary judgment remains applicable. Summary judgment should be rendered if the pleadings, the discovery, the disclosure materials on file and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c). A party opposing summary judgment may not rely merely on allegations or denials in its own pleading; rather, its response must — by affidavits or as otherwise provided in Rule 56 — set out specific facts showing a genuine issue for trial. FED. R. CIV. P. 56(e)(2). An issue is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).

A party seeking summary judgment always bears the initial responsibility of informing the trial court of the basis for its motion.

---

[1] She has since retired from the position of Director of Environmental Health.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). Rule 56(e) then requires the nonmoving party to go beyond the pleadings and "by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Id. Accord, Anderson v. Liberty Lobby*, 477 U.S. at 256-57. ("The movant has the burden of showing that there is no genuine issue of fact, but the plaintiff is not thereby relieved of his own burden of producing in turn evidence that would support a jury verdict . . . This is true even where the evidence is likely to be within the possession of the defendant, as long as the plaintiff has had a full opportunity to conduct discovery.") In determining whether a genuine factual issue exists, a trial judge must view the evidence in the light most favorable to the nonmoving party. *Hancock Indus. v. Schaeffer*, 811 F.2d 225, 231 (3d Cir.1987).

The Supreme Court of the United states has stated that "[a] trial judge must bear in mind the actual quantum and quality of proof necessary to support liability . . . For example, [t]here is no genuine issue if the evidence presented in the opposing affidavits is of insufficient caliber or quantity to allow a rational finder of fact to find actual malice by clear and convincing evidence." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 at 254.

In a case such as this, claiming defamation by a public official, the judge must apply the clear and convincing standard of proof to the Motion for Summary Judgment, which would be the standard applicable to the finder of fact at trial. *Anderson v. Liberty Lobby*, 477 U.S. at 255. Even though the clear and convincing standard applies, "[i]t by no means authorizes trial on affidavits. Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge. . . The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby*, 477 U.S. at 255. Thus, the Court, in deciding the summary judgment motion, may not weigh the available evidence, but must necessarily assess it, viewed in the light most favorable to the non-movant, against the substantive evidentiary standard of proof that would be used at trial. *Id.* at 265.

Whether a fact is material for purposes of Rule 56 motions is determined by substantive law. *Anderson v. Liberty Lobby*, 477 U.S. at 248. Said the Court:

9

Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted. This materiality inquiry is independent of and separate from the question of the incorporation of the evidentiary standard into the summary judgment determination. That is, while the materiality determination rests on the substantive law, it is the substantive law's identification of which facts are critical and which facts are irrelevant that governs. Any proof or evidentiary requirements imposed by the substantive law are not germane to this inquiry, since materiality is only a criterion for categorizing factual disputes in their relation to the legal elements of the claim and not a criterion for evaluating the evidentiary underpinnings of those disputes. *Id.*

For purposes of the case at hand, it thus becomes important to turn to the substantive law governing libel suits against public officials.

### Defamation

 Defamation is a common law tort, defined by the Restatement, Second of Torts as follows:

§ 558 Elements Stated

To create liability for defamation there must be:
 (a) a false and defamatory statement concerning another;
 (b) an unprivileged publication to a third party;
 (c) fault amounting at least to negligence on the part of the publisher; and
 (d) either actionability of the statement irrespective of special harm or the existence of special harm caused by the publication.

§ 559 Defamatory Communication Defined

A communication is defamatory if it tends so to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him.

\* \* \* \* \*

10

§ 568 Libel and Slander Distinguished

(1) Libel consists of the publication of defamatory matter by written or printed words, by its embodiment on physical form or by any other form of communication that has the potentially harmful qualities characteristic of written or printed words.

(2) Slander consists of the publication of defamatory matter by spoken words, transitory gestures or by any form of communication other than those stated in Subsection (1).

(3) The area of dissemination, the deliberate and premeditated character of its publication and the persistence of the defamation are factors to be considered in determining whether a publication is a libel rather than a slander.

■ There has long been a recognition that a tension exists between the tort of defamation and the right of free speech guaranteed by the First Amendment.[2] In *New York Times Co. v. Sullivan*, 376 U.S. 254, 84 S. Ct. 710, 11 L. Ed. 2d 686 (1964), the Supreme Court of the United States held that in a libel suit brought by a public official, the First Amendment requires the plaintiff to show that in publishing the defamatory statement, the defendant acted with actual malice, that is "with knowledge that it was false or with reckless disregard of whether it was false or not." *Id.* at 280. Reckless disregard, said the Court, is "not just ordinary negligence or carelessness in publishing the matter complained of," [but rather] "a wanton disregard of plaintiff's rights." *Id.* at 284. Further, if the person publishing the statement thinks it is substantially correct *at the time of publishing*, actual malice cannot be found, *even if it turns out that the statement is incorrect. Id.* at 286 (emphasis added). A public figure must adduce sufficient evidence to permit the conclusion that the defendant entertained "serious doubts as to the truth of his publication." *St. Amant v. Thompson*, 390 U.S. 727, 731, 88 S. Ct. 1323, 20 L. Ed. 2d 262 (1968); *see also Harte-Hanks*, 491 U.S. 657, 663. Libel may also be found where

---

[2] Which provides, in pertinent part, that "Congress shall make no law . . . abridging the freedom of speech, or of the press. . . ." United States Constitution, Amendment 1. The First Amendment is applicable to the states through the Due Process Clause of the 14th Amendment of the United States Constitution. *Gitlow v. New York*, 268 U.S. 652, 664, 45 S. Ct. 625, 69 L. Ed. 1138 (1925).

11

the defendant made the disputed publication with a "high degree of awareness of probable falsity." *Garrison v. Louisiana*, 379 U.S. 64, 74, 85 S. Ct. 209, 13 L. Ed. 2d 125 (1964); *see also Harte-Hanks*, 491 U.S. 657, 681 (1989).

■ *New York Times* and its progeny have set forth "exacting standards" for a finding of malice. *St. Amant*, 390 U.S. at 731; *see also Gertz v. Welch*, 418 U.S. 323, 337, 94 S. Ct. 2997, 41 L. Ed. 2d 789 (1974). First, arguments pertaining to the truth of the disputed matter are irrelevant. *NY Times*, 376 U.S. 254 at 271-72. ("Authoritative interpretations of the First Amendment guarantees have consistently refused to recognize an exception for any test of truth whether administered by judges, juries, or administrative officials . . . The constitutional protection does not turn upon the truth, popularity, or social utility of the ideas and beliefs which are offered.") *Accord, St. Amant v. Thompson*, 390 U.S. 727, 731-32. ("*New York Times* and succeeding cases have emphasized that the stake of the people in public business and the conduct of public officials is so great that neither the defense of truth nor the standard of ordinary care would protect against self-censorship and thus adequately implement First Amendment policies. . . [I]t is essential that the First Amendment protect some erroneous publications as well as true ones.")

■ A newspaper's alleged motive in publishing a story cannot provide a sufficient basis for finding actual malice. *Harte-Hanks*, 491 U.S. at 665. As one court stated: "[N]either negligence nor failure to investigate, on the one hand, nor ill will, bias, spite, nor prejudice, on the other, standing alone, [are] sufficient to establish either a knowledge of the falsity of, or a reckless disregard of, the truth or falsity of the materials used." *Goldwater v. Ginzburg*, 414 F.2d 324, 342 (2d Cir. 1969). Similarly, "[t]he deliberate choice of [one of several possible] interpretation[s of events], though arguably reflecting a misconception, [is] not enough to create a jury issue of 'malice' under New York Times. *Time, Inc. v. Pape*, 401 U.S. 279, 290, 91 S. Ct. 633, 28 L. Ed. 2d 45 (1971).

■ The Supreme Court and the Third Circuit have made it clear that neither poor journalistic practices nor the failure to investigate constitute actual malice. *See, e.g., St. Amant v. Thompson*, 390 U.S. at 730-31; *Marcone v. Penthouse Int'l Magazine for Men*, 754 F.2d 1072, 1089 (3d Cir. 1985); *Tucker v. Fischbein*, 237 F.3d 275, 286 (3d Cir. 2001); *Long v. Arcell*, 618 F.2d 1145, 1148 (5th Cir. 1980). ("Although the Constitution neither condones nor encourages careless journalistic practices, the

12

journalist who merely is careless may not be held liable for defaming a public figure."). *"Even an extreme departure from professional standards, without more, will not support a finding of actual malice. Tucker,* 237 F.3d at 286. *See also Harte-Hanks,* 491 U.S. at 665 (emphasis added).

■ Actual malice in First Amendment publication contexts may lie where actual knowledge of falseness by the person making the defamatory statements can be proved, *Tucker,* 237 F.3d at 285, or where there is sufficient evidence to permit the conclusion that he defendant "in fact entertained serious doubts" as to the truth of the publication. *St. Amant,* 390 U.S. at 731-32. ("[R]eckless conduct is not measured by whether a reasonably prudent man would have published, or would have investigated before publishing. There must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication. Publishing with such doubts shows reckless disregard for truth or falsity and demonstrates actual malice.") Finally, a journalist's purposeful avoidance of the truth may support a claim of actual malice, but only if sufficient circumstantial evidence can be produced. *Tucker,* 237 F.3d at 286; *Harte-Hanks,* 491 U.S. at 665.

■ In assessing alleged libel and slander for purposes of summary judgment motions, "summary judgment is quite often appropriate because of the difficulty a public official has in showing actual malice." *St. Surin v. Daily News,* 30 V.I. 373, 21 F.3d 1309, 1316 (3rd Cir. 1994). In libel actions, "competing policy considerations may argue for granting summary judgment. Actions that involve questions of malice often are disfavored torts; that is especially true of those that threaten the free exercise of important rights such as speech and press. Viewed from this perspective, summary adjudication may be thought of as a useful procedural tool and an effective screening device for avoiding the unnecessary harassment of defendant." 10B CHARLES ALAN WRIGHT, ARTHUR R. MILLER & MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE § 2730 (2008). As the D.C. Circuit observed in a libel action against a newspaper:

> [T]hat state of mind should generally be a jury issue does not mean it should always be so in all contexts, especially where the issue is reck-lessness, which is ordinarily inferred from objective facts. Summary judgment serves important functions which would be left undone if courts too restrictively viewed their power. . . . In the First Amendment area, summary procedures are even more essential.

*Washington Post Co. v. Keogh*, 365 F.2d 965, 967-68, 125 U.S. App. D.C. 32 (D.C. Cir. 1966).

██ "Therefore, unless plaintiff can produce some affirmative evidence to indicate that malice existed, summary judgment may well be granted in these cases." 10B CHARLES ALAN WRIGHT, ARTHUR R. MILLER & MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE § 2730 (2008). The argument has been rejected that summary judgment should seldom if ever be granted to defendant when his or her state of mind is at issue because the jury might disbelieve defendant or defendant's witnesses regarding that issue. *Id.* "As Justice White explained, the fact that courts must be sensitive to the difficulty of summary dispositions in malice cases does not relieve plaintiffs of the obligation under Rule 56(e) of coming forward with some facts or probative evidence to support the complaint. If no evidence supporting a finding of malice is presented, summary judgment is proper." *Id.*

An instructive example of a showing of actual malice sufficient to withstand a motion for summary judgment is found in *St. Surin v. Daily News*, 30 V.I. 373, 21 F.3d 1309 (3rd Cir. 1994). In that case, the Third Circuit reversed the District Court's grant of summary judgment under the following facts:

A newspaper reporter[3] interviewed a federal prosecutor about potential criminal charges arising from an investigation of a public official. The prosecutor confirmed that there was an investigation of the official, but refused to state that charges would be filed. The reporter accurately paraphrased the statements given by the prosecutor in his notes of the conversation. The reporter prepared an initial draft of the article that also accurately paraphrased the prosecutor's comments. An editor changed the article to state that the government expected to file charges against the official the following week. No criminal charges were ever filed and the official sued the newspaper for defamation.

In opposing summary judgment, the newspaper could not identify any source for the editor's change in the article's substance. The reporter stated in his deposition that the decision to change the story was the editor's. In her deposition, the editor testified that she had separate sources which indicated the investigation was going to result in charges,

---

[3] The newspaper was, in fact, the Daily News, the defendant in this case.

14

but she also stated that her edits to the reporter's story were based solely on the reporter's research.

The reporter's recollections and his notes of his conversation with the prosecutor indicated that he accurately quoted the prosecutor as saying "there will [be] some kind of action taken on that shortly." Nowhere did the reporter's notes or his deposition testimony indicate the prosecutor believed that criminal charges would be filed within a week.

As a result, the Third Circuit held that, viewed again in the light most favorable to the official, the record shows the editor was aware of facts showing her changes to the article made it false. The Court stated that:

> The Daily News argues it was negligent not reckless but points to no evidence that could indicate any source for the mistake about what [the prosecutor] said. [The editor] may have told [the reporter] the information came from an additional source, but the only source this record shows is [the reporter], and his testimony flatly contradicts the article's version of what [the prosecutor] said. While it might have been merely negligent to misattribute the quote, a fabrication of what [the prosecutor] said is enough to show a "high degree of awareness of . . . probable falsity," *Garrison*, 379 U.S. at 74, or a reckless disregard for the truth. *Id.*

## Analysis

### Statements Alleged by Plaintiff to be Defamatory

The statements that Joseph alleges to be defamatory are listed and numbered as separate items in her Memorandum in Support of Plaintiff's Opposition to Defendant's Motion for Summary Judgment. They will be numbered correspondingly in this Option and analyzed individually. As required by law, the facts are taken in the light most favorable to the Plaintiff.

Two matters of general importance are noteworthy:

1. Juanita Bris Johannes, an employee supervised by Ethlyn Joseph at the time of, and prior to, the publication of the articles, has testified that she could have been the source of the statements made by the Daily News about Joseph in the articles. In some instances she has confirmed that she provided the Daily News with information contained in the articles,

although in other instances she does not specifically recollect whether she was a source, but does not deny the possibility that she was.[4]

2. It is undisputed that Joseph did not talk to the Daily News when contacted prior to the publication of the articles, and the record appears to be devoid of any information that was in the possession of the Daily News prior to the publication of the articles which contradicted any of the statements that Joseph identifies as defamatory.

### 1. "Allegations of corruption taint restaurant inspections — employees, officials and restaurateurs point finger at Ethlyn Joseph."

Joseph admits that one of her employees, Juanita B. Johannes, made such allegations to Lee Williams, but asserts that Johannes had no facts to support them.[5] Joseph also points out that a second employee who Williams identified as a source of this information, Karen Gonzalez, denies having given him any such information.[6]

Lee Williams, a reporter for the Daily News and author of the articles, testified that a restaurateur by the name of Sinclair Crabb[7] and a woman whose name he could not recall "from Brooks Bar" gave him information that Joseph solicited bribes. Joseph denies ever having paid an official visit to Brooks Bar, although she did not communicate this to the Daily News prior to the publication of the articles.[8]

A public official, then-Commissioner of Licensing and Consumer Affairs Andrew Rutnick, testified that he had a conversation with Williams in which he told Williams that he heard certain businesses under the jurisdiction of Environmental Health complain that they were being asked for bribes, but that he never received specific evidence that this was so.

---

[4] Johannes Deposition at pp. 98-99, 113.

[5] Pages 99-110 of Johannes' deposition contain repeated assertions by Johannes that she saw Joseph receive and keep large amounts of cash without depositing it in accordance with procedure.

[6] Johannes testified that she believed that Gonzalez accompanied her to an interview with Williams, and that Gonzalez did accompany her to an interview with an agent of the Federal Bureau of Investigation.

[7] Named as a party to this case, but never served.

[8] *See also* Johannes Deposition, p. 144.

16

 Thus, at least one of Joseph's employees and one public official made statements which support the statement that Joseph alleges to be defamatory. There is nothing of record that indicates that the Daily News had contradictory information at the time of publication, particularly given Joseph's refusal to be interviewed. Also, Williams testified that supporting statements were made by Crabb.[9] Under these circumstances and as to this statement, the Court does not find that there is clear and convincing evidence, even viewed in the light most favorable to the plaintiff, upon which actual malice may be found.

### 2. "Some local restaurants say environmental health director Ethlyn Joseph is extorting cash by threatening to close their businesses by questionable health code violations unless they pay her off."

Joseph notes in her opposition to the Summary Judgment Motion that the Defendants have not produced sworn testimony from any restaurant owner who admits to making such statements to the Daily News. Joseph also notes that the stories quoted Crabb, but that there is no affidavit or testimony from him of record.[10] However, Williams has testified that Sinclair Crabb and the late Ms. Colon, then-owner of the Brooks Bar,

---

[9] The Daily News has produced an affidavit by Crabb in which he claims that he did make such supporting statements. Joseph has asked the Court to strike this affidavit as untimely and as filed in contravention of LRCi 7.1. The Court does not view the Crabb affidavit as material. Williams has testified that the statements attributed to Crabb were made by him. Although Plaintiff's Memorandum in Opposition to the Motion for Summary Judgment contains a statement, "Mr. Crabb has denied to counsel making any such statements to the Daily News. . . ." Williams' testimony is not contravened by the record, since unsworn allegations of counsel in a legal memorandum are not evidence. *Anderson v. Greene*, No. Civ. 05-0393-WS-M., 2005 U.S. Dist. LEXIS 38684 at *23, [WL] (S.D. Ala. 2005); *see also* FED. R. CIV. P. 56(e) ("When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denial of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial."). Joseph has additionally produced a "Settlement Agreement" which purports to be a disavowal by Crabb that he made any allegations of corruption against Joseph, but it is signed by an individual identifying himself as Crabb's counsel, and not by Crabb. Although the Court does not view the Crabb affidavit as material, the Court notes that consideration of the affidavit would not be unfair to Joseph, particularly in light of several extensions she received to reply to the summary judgment motion.

[10] But *see* footnote 9 above.

were among the restaurateurs who gave him unsolicited information that the health inspections were corrupt.[11]

Once again, there is evidence of record of statements by third parties that support the allegations made by Williams in the articles,[12] and there is no evidence of record indicating that Crabb or Colon did not make the statements, that the Daily News misattributed statements to them, or that the Daily News had in its possession other facts that indicated that the statements which it attributed to Crabb were false. Thus, the Court cannot find that clear and convincing evidence to deny the motion for summary judgment exists in the record before it.[13]

### 3. "Ms. Joseph refused the Daily News request for an interview."

Joseph admits that she declined to talk to the Daily News because of a policy by her department not to talk to any newspapers. However, her testimony does not indicate that she advised the Daily News of her rationale for not speaking with them. The Daily News editor, Ms. Lowe Davis, testified that "she knew of a tight policy under the Turnbull administration that only commissioners and very often only Government House could speak."

▬▬ There may arguably be a distinction between a government official declining to speak to a reporter of her own volition and declining to do so as a result of an established policy, the former possibly suggesting an acknowledgment of culpability more than the latter. However, the statement that she declined to speak to the Daily News is true, and therefore a reasonable jury could not find that this statement was defamatory and made with actual malice by clear and convincing evidence.

---

[11] Defendant's Exhibit 3, Responses to Plaintiff Ethlyn Joseph's Interrogatories to the Daily News Publishing Company, Inc., Response to Interrogatory 5.

[12] Although Williams' statements as to what his sources told him are hearsay, they are admissible to show his state of mind, which is to say whether he wrote the articles with actual malice, F.R.E.

[13] *See also* Johannes Deposition, p. 50, 108, 150, 152, Williams Deposition p. 142.

### 4. "Health Department workers and other government officials confirmed the restaurateurs' allegations."

 As noted, then-Commissioner of Licensing and Consumer Affairs Andrew Rutnick testified that he had a conversation with Williams in which he told Williams that he heard that businesses under the jurisdiction of Environmental Health complained that they were being asked for bribes, but that he never received specific evidence that this was so. Further, Joseph admits that Ms. Johannes made allegations of corruption about her to Mr. Williams. The Daily News admits that its ordinary journalistic practices require at least two sources. However, even if reliance only on one source when publishing an article alleging corruption by a public official constitutes a departure from accepted journalistic standards, even an extreme departure, without more, will not support a finding of actual malice. *Tucker*, 237 F.3d at 286.[14]

### 5. "The Government workers described to the Daily news 'cash runs' during which Joseph has stopped at several restaurants during the course of an afternoon, collecting envelopes containing $100 bills and gold jewelry."

Joseph claims, at p. 19 of her Memorandum, that Ms. Johannes "denies any knowledge" of any wrongdoing by Joseph. This is a misrepresentation of Johannes' testimony. On pages 99-110 of her testimony, Ms. Johannes states that "there were inappropriate activities," that "persons were coming with $100 bills to her," that this money "should have been deposited up to [sic] the appropriate office, or those persons should have been told that we don't collect monies here; take the money over to the main office," that "once or twice, I've seen the monies," that at other times, Officer Richardson would inform Ms. Johannes that he knew that Joseph improperly received "crisp $100 bills," that Joseph would improperly "accept numerous and numerous of plates of food" for free, that Johannes saw Joseph collect a relatively large

---

[14] On most occasions Williams claims to have had at least two sources, typically Gonzalez and Johannes, *see* Davis Deposition, pp. 278-9, Williams Deposition, 238-40. However, as Gonzalez denied having served as his source in her deposition, the Court is required at the summary judgment stage to accept Gonzalez's denial as true in the face of Williams' assertion otherwise.

amount of cash in an envelope from the Fast Food China restaurant, and that Ms. Joseph also accepted money from Arab restaurateurs.[15]

Although Johannes states that she no longer remembers whether she was a source for the Daily News stories, she repeatedly acknowledges that she could have been (see pages 99 and 116). Joseph acknowledges that Williams testified that he remembers Ms. Johannes telling him about the incidents that Williams states gave rise to the headline in question. Additionally, the record does not reflect the Daily News being in possession of evidence at the time the articles were written that contradicted these allegations.

Seen in the light most favorable to Joseph, and in light of the applicable clear and convincing standard, this material does not create a genuine issue of material fact in relation to Williams' alleged reckless disregard. As shown, Johannes testified under oath that she had personally witnessed Joseph's misconduct.

### 6. "They say at times, restaurant inspections found major health violations — violations serious enough to close the restaurant — but Joseph met with restaurant owners behind closed doors and she nixed any citations."

Joseph admits that Johannes may have made such allegations, but notes that she is a single person whereas the article uses a plural pronoun ("they").

 The use of the plural pronoun may tend to create the appearance of added corroboration of Johannes' allegations. However, there is no dispute that Johannes did make the allegations, and therefore the Court finds that the pronoun number is irrelevant to the underlying issue of alleged *NY Times* malice. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson*, 477 U.S. at 248. Joseph's linguistic argument is thus discounted.

On a motion for summary judgment, the burden shifts onto the nonmoving party to go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file,

---

[15] *See also* Johannes Deposition, pp. 58-60, 102-3, 106.

designate specific facts showing that there is a genuine issue for trial. F. R. CIV. P. 56(e). Here, the Court notes that Joseph has not submitted such materials. Rather, Joseph admits to Johannes having given Williams statements about Joseph's alleged improper conduct. Plaintiff has thus not met the burden of showing that there is a genuine issue for trial.

**7. "Joseph, who is Governor Turnbull's first cousin, was appointed to the position after Turnbull was elected governor in 1999."**

Joseph asserts that she is Turnbull's fourth cousin. She also indicates that he had nothing to do with her appointment, although the pages to her own deposition that she cites for this proposition are not included in the exhibits received by the Court.

 This statement, while inaccurate, is not defamatory, in that it does not "so harm the reputation of another as to lower him[/her] in the estimation of the community or to deter third persons from association or dealing with him[/her]." RESTATEMENT (SECOND) OF TORTS § 559. The Court finds that whether Joseph was Turnbull's first or fourth cousin — or even a cousin at all — would not harm Joseph's reputation in the community. Further, it is undisputed that the newspaper printed a correction of the erroneous assertion as soon as the error was brought to the newspaper's attention. Additionally, Johannes testified that it was "firsthand knowledge" that Joseph was Turnbull's first cousin, and that she may have communicated this to the Daily News.[16]

**8. "Joseph routinely waives and voids fines on restaurants, employees said, even though she lacks the authority to do so."**

*– and –*

**9. "In addition, Joseph levies amounts that very widely from the fine schedule established by territorial law."**

 Here, Joseph takes issue with the fact that Williams' articles alleged that Ms. Joseph levied fines greater than allowed by the Virgin Islands Code in spite of his lack of knowledge as to what the precise fine

---

[16] Johannes Deposition at p. 151, Williams Deposition at 97.

21

schedule was. In his deposition, Williams admits that he has no recollection of whether he consulted the Virgin Islands code personally to verify the range of citations permissible under territorial law. Plaintiff's Exhibit 6 at 129. However, as Joseph herself states in her motion, Williams has testified that he based these two statements on information he received from Johannes and Gonzales. To wit: "I know both of these young ladies told me she [Joseph] would inflate the price and then drop the price. And I never found the exact price of what these type [sic] of violations were — what type of fine they were — would draw. . . I know I asked for a lot of documents on this and I now I asked for a history on some of the fines that have been given out. The citations — the only results I had — the only success I had was getting the citations from the two young ladies." *Id.* at 130. Seen in the light most favorable to Joseph, Williams' research of this issue may indeed seem meager. However, as noted above, poor journalistic practices and the failure to investigate do not constitute actual malice under the demanding standards set forth by *NY Times* and its progeny. *See, e.g., St. Amant*, 390 U.S. at 730-31; *Marcone*, 754 F.2d at 1089; *Tucker*, 237 F.3d at 286.

### 10. "Joseph has failed to use federal grant money earmarked to send Environmental Health Inspectors to stateside training in inspecting school lunch preparations".

Joseph argues that "Plaintiff had no authority over the use of the federal grant money for this purpose and this was yet another false accusation" and again complains that "Williams admitted he did nothing to check this accusation." Williams did testify that allegations of this nature were made by Johannes and Gonzalez.[17] In support of her argument, Joseph cites to certain portions of her deposition of Williams contained on pages 168-69 and 171-72 of her Exhibit 6.

Under Rule 56, Joseph's burden is to go beyond her own pleadings and designate specific facts showing that there is a genuine issue for trial. Her bare allegation that she had no authority over the federal funds at issue does not meet this requirement. Viewing the issue in the light most favorable to Plaintiff, the Court thus turns to an analysis of the cited-to portions of Williams' deposition to see whether his research methods

---

[17] Williams Deposition at 168-69 and 171-72. As noted earlier, Johannes has testified that she could have been the source for statements made by the Daily News in the articles.

22

were so lacking in support as to, perhaps, have created a "reckless publication" under *St. Amant*, at 731-32, which would support a finding of *NY Times* actual malice.

In doing so, the Court finds that in arguing to the Court that Williams "did nothing" to verify the information that had allegedly been given to him by Johannes and Gonzales (Williams deposition at 171-72), Joseph significantly misrepresents Williams' testimony. For example, when asked what, if anything, he did to verify these particular allegations, Williams testified that he "would have loved to have spoken to Miss Joseph about it but she would not take my calls." Exhibit 6 at 168. When asked whether "the whole basis for this allegation is just because [sic] Miss Gonzales and Miss Johannes told you that?" Williams again replied that "I tried to talk to Miss Joseph about it . . . but she did not take my calls." Exhibit 6 at 172. Further, Williams stated that he placed "a lot" of calls to Ms. Joseph "over a long and extended period of time," and that the newspaper "try and [sic] move heaven and earth" to verify stories of this importance. Exhibit 6 at 174. As mentioned, Joseph disputes Gonzales[18] having given any statements to Williams, but she does not dispute Johannes having provided Williams with the information that he used in the articles. *See* Plaintiff's Memo at 27-29. Further, her own deposition of Williams shows that he and the Daily News tried extensively to discuss the matter with Ms. Joseph. Although they were unsuccessful in doing so, the above cited-to portions of the deposition would not allow a reasonable jury to find actual malice or reckless disregard for the truth by clear and convincing evidence. Joseph has also failed to identify any clear and convincing evidence that Williams in fact entertained serious doubts about this particular statement at the time of its publication. *St. Amant*, 390 U.S. at 731-32.

**11. "Joseph has no schedule for inspecting restaurants. As a result, some restaurants in the territory have not been inspected for years". "Joseph has not established a clear policy for conducting an inspection".**

As to the issue of whether any schedules or other policies existed for conducting restaurant inspections, Williams has testified as follows:

---

[18] As noted below, some portions of Gonzales' testimony cited to by Plaintiff is inexplicably missing from the record presented to the Court. Such information could have been useful to the Court is missing from the otherwise lengthy record.

23

Q. I see something that looks to me like [a] suggested checklist?

A. . . . So Juanita [Johannes] told me that she suggested making a checklist that would make the inspections easier and probably more difficult to extort . . . (Plaintiff's Exhibit 6, pp. 157-58)

Q. All right. Just let me make sure I understand before we go on. Was it your understanding that no checklist existed or that one existed, but it was not used?

A. Juanita told me they did not use a checklist when they went out to do the inspection. (*Id.* at 159.)

Q. All right. . . Miss Johannes is saying that she had recommended to her coworkers that they work on some type of standard operating procedures for food establishment inspection because clients were complaining?

A. Yes. (*Id.* at 164).[19]

Thus, there is at least some evidence of record which supports the Daily News' assertion about a lack of schedules, and no evidence of record that the Daily News was in possession of contrary information prior to publication of the articles.

**12. "The division is short staffed with two of the six inspector positions vacant, but Joseph allows only two inspectors out side the office. She has ordered the other two inspectors to sit at their desks, doing no work, as punishment for refusing to follow her directives."**

Initially, the Court notes that Plaintiff cites to certain pages of Gonzales' testimony which are absent from the record. This is a cause of concern for the Court because it has rendered it impossible for the Court to verify the truth of Plaintiff's allegation on this account, namely that "Ms. Gonzales allegedly testified that she was not sent out in the field because she was still in training." Plaintiff's Memo page 32, citing to page 16 of Gonzales' testimony, which starts on page 20, *see* Plaintiff's Exhibit 7.

However, Joseph admits that Williams received information in this regard from at least Johannes. Plaintiff's memo p. 32. Williams' own testimony shows this to be the case, to wit:

---

[19] *See also id.* at 77.

24

Q. Now Miss Johannes got grounded?

A. Yes.

Q. Did Miss Johannes indicate to you that she was, therefore, assigned to desk duty from that time on?

A. She told me she wasn't allowed to leave the office.

Q. Was the same true for Miss Gonzales?

A. I believe so.

Q. Does Miss Johannes indicate to you that this grounding continued during the entire time that Ethlyn Joseph was in Environmental Health?

A. I'm not sure what the duration of the grounding was.

Plaintiff's Exhibit 6, p. 182; *see also* William's testimony at 313-14 (stating his lack of memory about events that happened three and a half years ago.).

Thus, the record reflects the fact that Williams had a source for his information and no contrary evidence. Plaintiff has not shown that Gonzales may indeed not also have corroborated Johannes' information because, as stated, parts of Gonzales' testimony are missing from the record presented to the Court.[20]

For these reasons, no genuine issue of material fact as actual malice exists with respect to this statement.

### 13. "In one case the employees said, Joseph told the employees to falsify the division annual report by using fictitious numbers of the amount of revenue the division collected in 2003."

As to this statement, Joseph complains that Williams may only have discussed the falsification allegations with one or two employees, namely Gonzales and Johannes. It remains undisputed that Williams talked to at least Johannes about the matter.[21] As set forth above, basing an article on only one source may be a departure from professional standards, but even this does not support a legal finding of actual malice. *Tucker*, 237 F.3d at 286. The Court thus turns to Johannes' deposition testimony to verify

---

[20] *See also* Johannes Deposition at 86.

[21] Johannes Deposition at p. 160, Williams Deposition at pp. 121-2.

whether this may present a genuine issue of material fact which a reasonable jury could find to be proof of Williams' reckless disregard of the truth.

Joseph fails in showing a genuine issue as to the conversation reported in the segment of the testimony which she highlights in her memorandum of law. To wit: on page 67 of Johannes' testimony, Johannes reported having said to Ms. Joseph that "you must have supporting documentation. You can't drum up figures out of nowhere and can't [sic] explain how you arrived at it."[22] Again, the importance of this is not whether these allegations are true or false, but rather that Joseph has not disputed Johannes having conveyed these and other concerns to Williams, who in turn relied upon them for his articles having no contrary information.

Incidentally, Johannes continued to testify that a Mr. Richardson of the Department of Health was present during Johannes' discussions of the annual and monthly reporting with Ms. Joseph. Joseph correctly points out that Richardson answered in the negative when asked the narrow question of whether he "saw or knew" that Ms. Joseph falsified these reports. Richardson deposition at 6. However, these interoffice exchanges and the discussion with Mr. Richardson veer off the topic of Williams' alleged libelous state of mind at the time he wrote the articles, which is what the Court must examine. *New York Times Co. v. Sullivan*, 376 U.S. at 286; *see also Goldwater v. Ginzburg*, 414 F.2d at 342.

Returning to the applicable legal standard, it becomes clear that the pages identified by Joseph here do not clearly and convincingly show that a reasonable jury could find that Williams either had actual knowledge that his reports were false or demonstrated a reckless disregard of their truth at the time of publication. He had at least some foundation for his stories. Similarly, even if Williams wanted to perceive the allegations presented to him by Johannes in a certain way in order to write a story from a certain point of view rather than another, "[t]he deliberate choice of such an interpretation, though arguably reflecting a misconception, [is] not enough to create a jury issue of 'malice' under New York Times. *New York Times Co.*, 401 U.S. at 290.

---

[22] *See id.* at p. 52.

**14.** "On Tuesday, by phone calls and faxes, other restaurant owners told the Daily News that Joseph also had extorted money from them".

*– and –*

**15.** "Describing the Health Department as 'corrupt' a restaurant owner wrote that Joseph is taking money with one hand and turning a blind eye to seriously dangerous health situations with the other".

Here, Joseph complains of Williams' failure to identify "a single restaurant owner" who told him that Joseph solicited or accepted bribes, yet goes on to acknowledge that Williams received such information from two identified sources — Mr. Crabb[23] as well as a specific person from the Brooks Bar — in addition to an anonymous source who spoke with Daily News editor Lowe Davis. Exhibit 6 at 220. Thus, Joseph has failed to create an issue of fact as to the existence of actual malice with respect to this statement.

**16.** "Health employees told the Daily News that Joseph prefers to target restaurants owned by down islanders, Arabs, Dominicans, Asians and other minorities — groups less likely to complain to authorities."

Although this assertion does not find much support in the record before the Court, as noted above, the testimony of Juanita Bris Johannes leaves open the possibility that she is the source of this information, as the Daily News claims. Johannes also testified that she saw Joseph accept hundred dollar bills from Fast Food China,[24] and also that she saw "people like the Arabs" giving Joseph cash.[25]

■ According to the United States Supreme Court: "If the person publishing the statement thinks it is substantially correct *at the time of publishing*, actual malice cannot be found, *even if it turns out that the statement is incorrect.*" *NY Times*, 376 U.S. at 286. This is the problem that Joseph cannot overcome. While she asserts that Williams did not do sufficient research into the veracity of his sources, but cannot adduce

---

[23] *See also* footnote 9 above.

[24] Johannes deposition at pp. 106-7.

[25] *Id.* at 107.

evidence that would create an issue of fact as to whether he either fabricated facts or published in possession of knowledge that would cause him to entertain grave doubts about the accuracy of his articles. Thus, there is no evidence that would create an issue of fact as to the existence of actual malice.

**17. The Daily News alleged that Joseph improperly met with restaurant owners behind closed doors to discuss improper matters and otherwise engaged in improper conduct at those meetings.**

Here, Plaintiff correctly states that Johannes was the source of information for the above article content, but argues that these allegations "were never substantiated by the Daily News before printing [them]." Memo at 37. Davis' testimony paints a different picture as can be seen:

Q. Did she [Johannes] mention a name, or did either of those ladies [Gonzales or Johannes] mention a name for the person or persons at Concretas that Ms. Joseph met with?

A. Yes. Again, I don't remember the name.

* * *

Q. Was anything done by the Daily News to verify whether or not Ms. Joseph actually did meet with [certain restaurant owners]?

A. I know that Mr. Williams attempted to speak with them.

Q. Was he successful?

A. I don't believe so.

Q. All right.

A. Well, yes, I know he was successful in speaking with the owner of [one restaurant], who told him he was terrified of speaking against Ms. Joseph, that she would shut him down.

Q. All right.

A. Mr. Williams heard that a lot.

Plaintiff's Exhibit Exhibit 5 at 232-33.

As stated above under headline 10, Williams in turn steadfastly testified going through extensive efforts including attempting to call Ms. Joseph to verify the information upon which the articles were based. Although perhaps unsuccessful in doing so, the undisputed record still remains that Williams had at least two sources for his information:

28

Ms. Johannes and one restaurant owner. Thus, no actual malice or reckless disregard can be found here.

**18. The Daily News falsely reported, *without any substantiation*, that the commissioner of Health Darlene Carty was having a list of allegations against Plaintiff drafted to take the Inspector General.** (Emphasis added).

In her memorandum, Joseph protests that "Mr. Williams admitted he had *no* facts to support those allegations" and "*all* Carty told Williams was 'we know we have issues to deal with and we will take appropriate action.'" (Emphasis added).

A closer reading of the transcript reveals another picture. After Williams points out that the relevant notes from his meeting with Ms. Carty could be found on page 1143 of his notes, which in itself tends to cast doubt upon Joseph's claim of "no" substantiation, the following exchange took place:

Q. Where?

A. Under Carty. The first thing under the line. But, in the story that she or that I wrote, it has her quotes in there *verbatim* [sic].

Q. Okay. Where is that?

A. Carty — the last page we were just on, *Carty calls for probe of chief* — it would have been after the initial publication, I believe.

Q. All right. And what particular quote?

A. *We know we have issues to deal with and we will take the appropriate action.*

Q. Do you know what action, if any, was taken by Miss Carty?

A. Well, she called for a probe. That was some type of investigation.

Plaintiff's Exhibit 6 at 214-15 (emphasis added).

 Thus, it is not correct that there is no evidence of record that Williams had no substantiation for the published statements, or that there is evidence of record tending to show that he did not. Therefore, the evidence presented by Joseph here would not allow a reasonable jury to find actual *NY Times* malice.

**19. Unsupported statements supposedly made by one restaurant owner, Crabb who had been asked multiple time by various health inspectors [sic.] were printed in the Daily News not as allegations, but as if they were true when they bad not been substantiated and reasonable investigation required before printing them would have revealed they were false.**

Initially, the Court emphasizes the rule that actual malice cannot be found, *even if it turns out that the statement is incorrect*, *NY Times*, 376 U.S. at 286, and thus again disregards Plaintiff's arguments regarding the truth or falsity of the published statements. The Court thus turns to the applicable legal standard of whether Joseph can now clearly and convincingly show that a genuine issue exists as to Williams' allegedly malicious or reckless state of mind at the time of the publications. *Id.*

 ██ At bottom, Joseph argues (1) that William's investigative reporting was careless and (2) that the only standard he applied in verifying statements given to him by his sources was "whether or not he believed them." *See*, *e.g.*, Memorandum in Support of Plaintiff's Opposition to Motion for Summary Judgment at p. 40 As shown above, the first would not allow a jury to find actual malice or reckless disregard of plaintiff's rights. As for the latter, the Court finds that Joseph does not accurately describe Williams' deposition testimony. In pertinent part, this shows the following:

> Q. Was it your purpose[26] in writing the story to determine whether or not the allegations by these young women, these young ladies that came to you, were true or false?
>
> A. It was my job as a journalist to decide whether or not I believed them, and I did.

Also, when asked whether Mr. Williams came across anything during the course of his investigation for any of the stories that would contradict anything that Sinclair Crabb, Karen Gonzales or Juanita Johannes told him, Mr. Williams repeatedly said no. Plaintiff's Exhibit 6 at 239. For example:

---

[26] The Court emphasizes the fact that a newspaper's alleged motive in publishing a story cannot provide a sufficient basis for finding actual malice. *Harte-Hanks*, 491 U.S. at 665.

30

Q. Now I want you to taken an overall view of your investigative journalism for this story. Did you come across anything that gave you any reason to believe or any reason to doubt . . . Did you come across any reason to believe in any of your investigation that the things that you were writing in these articles was not true?
A. Not at all.
Q. Or not accurate?
A. No. Not until after we published.
Q. And what is it that you came to believe was inaccurate or untrue after you published?
A. Well, the relationship between the governor and Miss Joseph.
Q. And what did you do about that?
A. Oh, we immediately corrected it. That's — when we make a mistake, we correct it immediately.

Plaintiff's Exhibit 6 pages 238-40.

 Plaintiff acknowledges that Williams performed at least some investigative research. It is undisputed that Williams received information from several different sources, and there is no evidence that he possessed evidence to the contrary.

### Summary

 At bottom, Joseph complains that Defendants printed a series of articles about her which, according to Joseph, were materially incorrect, and argues that the Defendants did not have sufficient substantiation of the allegations that were printed. Defendants counter that they undertook several efforts to verify the information which, according to them, they received from not just one, but several sources. Since there is no evidence that Williams displayed either actual malice or reckless under the *NY Times* standard at the time of publication, Defendants argue, they must win on this motion for summary judgment. The Court agrees.

As stated above, in order to defeat a motion for summary judgment, Federal Rule 56 of Civil Procedure requires the nonmoving party to designate specific facts showing that there is a genuine issue for trial. *Anderson v. Liberty Lobby*, 477 U.S. at 256-57. To do so, the nonmoving party must identify evidence that would support a jury verdict. *Id.* In assessing the record, the Court must see it in the light most favorable to the nonmoving party, *Hancock Indus.*, 811 F.2d at 231, but must also

apply the clear and convincing standard of proof to the evidence presented. *Anderson v. Liberty Lobby*, 477 U.S. at 255; *see also In re Jobes*, 108 N.J. 394, 441, 529 A.2d 434 (holding this to be "evidence so clear, direct and weighty and convincing as to enable [the factfinder] to come to a clear conviction, without hesitancy, of the truth of the precise facts in issue."). The substantive law directs the analysis and shows that for a defendant to be held liable for libel or slander, the defendant must — at the time of the publication — have displayed more than poor journalistic practices or even an extreme departure from professional standards, but recklessness so severe that plaintiff's rights were wantonly disregarded. *NY Times Co.*, 376 U.S. at 284. Even the truth of the publications does not suffice for a finding of malice. *Id.* at 271-72. The standard for public officials has been set forth in numerous cases in which the United States Supreme Court held that such officials must adduce sufficient evidence to permit the conclusion that the defendant entertained "serious doubts as to the truth of his publication," *St. Amant v. Thompson* 390 U.S. at 731, or made the disputed publication with a "high degree of awareness of probable falsity." *Garrison v. Louisiana*, 379 U.S. at 74.

Plaintiff fails to meet these demanding standards here. She complains that the articles are not true, which is of no import to the Court's analysis. She complains that Defendants did not perform what in her opinion would be sufficient and acceptable research. As analyzed above, this too bears no importance to the issue.[27] Plaintiff often points out that her witnesses *now* claim that they did not give certain statements to Williams before the publication of the articles. However, under both Rule 56, *NY Times* and its progeny, plaintiff must produce evidence sufficient to show that a genuine issue of material fact exists as to Defendant's malice *at the time of publication. New York Times Co.*, 376 U.S. at 286. The Court finds that Plaintiff has not done so. In fact, one of Plaintiff's exhibits shows some steps that the Daily News took steps to verify whether the articles could be perceived as being defamatory:

> A. Prior to publication of the stories on March the 23rd, we had consulted with our attorney. And the layout was done in the afternoon and

---

[27] In so doing, the Court has noted that Plaintiff often misrepresents the Defendants' testimony, which is unacceptable legal practice. Plaintiff is advised not to repeat this in the future.

finished in the early evening and faxed to our attorney to be read and reviewed to ensure that we had been — had not recklessly disregarded the truth, that we were not libeling anyone. And we — our term is "vetted" — we vetted it with our attorney . . . [H]e knew of the story as it was developing and how we were handling it. And we checked in with him about how we were dealing with the sources, how we were — what steps we were taking to substantiate and verify. And then he read the stories, the headlines, the layout, and everything.

Plaintiff's Exhibit 5 at 81-82. Whether the statements turned out to be true or not, this sworn testimony would not allow a rational factfinder to find malicious intent or state of mind at the time of publication. Had Defendants had such, there would have been no reason for them to contact an attorney in trying to make sure that they articles stayed within legal bounds. Therefore, the Court rules as follows:

As to Count I, Defamation, libel, and slander, the Court finds that Joseph has failed to create an issue of material fact as to the existence of actual malice under the applicable clear and convincing evidence standard.

As to Count II, Breach of the duty of good faith, the covenant of good faith and fair dealing is implied in contractual relationships, RESTATEMENT (SECOND) OF CONTRACTS § 205, and the Court finds no evidence of a contractual relationship between the parties.

As to Count III, negligent infliction of emotional distress, the Court finds that Plaintiff has failed to create an issue of fact as to whether Defendants acted with actual malice, *see Hustler Magazine v. Falwell* 485 U.S. 46, 108 S. Ct. 876, 99 L. Ed. 2d 41 (1988).

As to Count IV, Punitive Damages, the Court finds that there is no underlying cause of action to support such a demand.

## Conclusion

For the above reasons, Defendants' Motion for Summary Judgment is GRANTED.